NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

CELULARITY INC.,

    Plaintiff,

        v.

EVOLUTION BIOLOGYX, LLC,

    Defendant.

No. 23cv2135 (EP) (LDW)

**OPINION**

**PADIN, District Judge.**

Plaintiff Celularity Inc. ("Celularity") bring various claims stemming from Defendant Evolution Biologyx, LLC's ("Biologyx") alleged breach of a distribution agreement between the parties. *See* D.E. 1 ("Complaint" or "Compl."). Biologyx, in turn, brings its own counterclaims against Celularity related to Celularity's own alleged breach of that same agreement. *See* D.E. 43 at 9–40 ("Counterclaim").[1]

Celularity now moves for summary judgment on its breach of contract (Count I of the Complaint) and account stated (Count VII of the Complaint) claims, as well as on Biologyx's breach of warranty (Counts Two, Three, and Four of the Counterclaim), quasi-contractual (Counts Six and Seven of the Counterclaim), fraud (Count Eight of the Counterclaim) counterclaims and Biologyx's requests for certain types of damages. D.E. 95-1 ("Celularity's Motion for Partial Summary Judgment" or "Celularity MSJ").[2] Biologyx opposes, D.E. 104 ("Opposition to Celularity's Motion for Partial Summary Judgment" or "Opp. to Celularity MSJ"), and cross-

---

[1] Biologyx answered Celularity's Complaint in pages 1–8 of D.E. 43 ("Biologyx's Answer").

[2] The Notice of Motion for Celularity's Motion for Partial Summary Judgment is at D.E. 95.

moves to amend its Counterclaim, D.E. 104-4 ("Cross-Motion to Amend"). Celularity replies and opposes Biologyx's Cross-Motion to Amend. D.E. 108 ("Celularity Reply").

Biologyx, in turn, moves for summary judgment on all of Celularity's remaining claims (the breach of contract, quasi-contractual, and account stated claims brought in Counts I, II, IV, V, and VI of the Complaint), as well as its own breach of contract (Count One of the Counterclaim), breach of warranty (Counts Two, Three, and Four of the Counterclaim), and good faith and fair dealing (Count Five of the Counterclaim) counterclaims. D.E. 96-1 ("Biologyx's Motion for Partial Summary Judgment" or "Biologyx MSJ")[3] (together with Celularity's Motion for Partial Summary Judgment and Biologyx's Cross-Motion to Amend, the "Motions"). Celularity opposes. D.E. 106 ("Opposition to Biologyx's Motion for Partial Summary Judgment" or "Opp. to Biologyx MSJ"). Biologyx replies. D.E. 107 ("Biologyx Reply").

The Court decides the Motions without oral argument. *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1(b). For the following reasons, the Court will **GRANT in part** and **DENY in part** both Celularity's Motion for Partial Summary Judgment and Biologyx's Motion for Partial Summary Judgment. The Court will further **DENY** Biologyx's Cross-Motion to Amend its Counterclaim as **MOOT** and **DISMISS** Biologyx's counterclaim for breach of the covenant of good faith and fair dealing in Count V of the Counterclaim.

## I.    BACKGROUND

### A.    Facts[4]

Celularity is a manufacturer of medical products derived from the human post-partum placental tissue. D.E. 95-2 ("Celularity SUF") ¶ 1. These products include: (1) Interfyl—a

---

[3] The Notice of Motion for Biologyx's Motion for Partial Summary Judgment is at D.E. 96.

[4] The facts in this Section, and throughout this Opinion, are undisputed unless otherwise indicated.

decellularized particulate human placental connective tissue matrix used for the replacement or supplementation of damaged or inadequate integumental tissue, D.E. 96-2 ("Biologyx SUF") ¶ 2, (2) Biovance, a decellularized amniotic membrane product used as a skin substitute, *id.* ¶ 64; *see* D.E. 106-21, and (3) Biovance 3L, a version of Biovance folded over to become three layered, *see* D.E. 106-21.

Interfyl was developed by Celgene Cellular Therapeutics ("Celgene"). Celularity SUF ¶ 2. Celgene had submitted a Request for Designation ("RFD") to the Food and Drug Administration ("FDA") requesting that its decellularized particulate human placental connective tissue matrix—later named Interfyl—be regulated under § 361 of the Public Health Service Act, 42 U.S.C. 6A §§ 201–300mm-64 (the "Act").[5] Celularity SUF ¶ 2; Biologyx SUF ¶ 3. A § 361 designation allows a product to be brought to market without prior FDA approval (provided it meets specific criteria) and therefore allows it to bypass the more burdensome approval process for biologics under § 351 of the Act. Biologyx SUF ¶¶ 3–4. Celgene was granted the § 361 designation on October 15, 2004. *Id.* ¶ 5. Neither the RFD nor the FDA grant of the designation reference Interfyl by name. *Id.* Celularity acquired Celgene in 2016, choosing to continue to manufacture Interfyl. Celularity SUF ¶ 3.

In April 2021, Saleem S. Saab, the Chief Executive Officer of Biologyx—a medical sales company, approached Dr. Stephen Brigido of Celularity with a proposal to become the exclusive

---

[5] Biologyx attempts to dispute that the drug for which Celgene submitted the RFD—which was then granted—was later named Interfyl, *see* D.E. 104-1 ("Response to Celularity SUF") ¶ 5, while simultaneously in its own SUF admitting the same and repeatedly characterizing Interfyl as a product regulated under § 361, *see* Biologyx SUF ¶¶ 4–5. The Court therefore finds that there is no dispute that the drug for which Celgene obtained the § 361 designation is now named Interfyl.

distributor of Interfyl in the Medicare Part B ("Part B") reimbursement space.[6]  Celularity SUF ¶¶ 7, 9.  As Saab explained to Dr. Brigido in a follow-up email the next month, Biologyx thought it "could help Celularity [with] navigating the reimbursement regime for TRG [the FDA "Tissue Reference Group"] approved flowables and would be able to offer assistance to Celularity in this regard."  *Id.* ¶ 15 (quoting D.E. 95-12) (first alteration added and second alteration in original).  Reimbursement claims for Part B are handled by Medicare Administrative Contractors ("MACs"), who act as insurance companies for Medicare under the supervision of the national Centers for Medicare Services ("CMS").  *Id.* ¶¶ 20 n.2, 21 n.3.

After more discussions and negotiations, the parties executed a Supply and Distribution Agreement effective September 1, 2021, D.E. 96-4 (the "Agreement").  Celularity SUF ¶¶ 19–20, 27, 30.  Under the Agreement, Celularity appointed Biologyx as its exclusive distributor of Interfyl reimbursed through Part B in the United States (with certain exceptions not relevant here).  *See id.* ¶¶ 31–33.  Celularity sold, and Biologyx bought, Interfyl through purchase orders.  *Id.* ¶¶ 34–35. The Agreement also allocated various responsibilities to the parties, with Celularity primarily taking on manufacturing and shipping responsibilities and Biologyx taking the lead on the commercialization of Interfyl.  *See infra* Section III.B.1.[7]  The Agreement also provided that "[n]either Party shall be liable for non-performance or delay in performance caused by an Event of Force Majeure."  Agreement § 12.5 (the "Suspension Force Majeure Provision").[8]  And in the

---

[6]  Part B is the outpatiet medical insurance arm of Medicare.  *See* https://www.ssa.gov/medicare/plan/medicare-parts.

[7] Because the Court quotes and discusses the key provisions of the Agreement in depth *infra* Section III.B.1, the Court does not reproduce that discussion in this Section, though it has briefly summarized the provisions relevant to contextualizing the key facts.

[8] "Force Majeure," in turn, is defined as "conditions beyond the reasonable control of the Parties . . . ."  *Id.* § 1.24.

event that it was a government action that created a Force Majeure event, the Agreement obligated both Biologyx and Celularity to "commit sufficient resources by which to dispute, contest and reverse such Governmental Authority action that would eliminate the Force Majeure event." *Id.* § 11.1(i) (imposing obligation on Celularity), § 11.2(i) (imposing obligation on Biologyx) (collectively, the "Government Action Force Majeure Obligations").

By November 19, 2021, Biologyx had already accumulated an outstanding balance of $676,300 on its account, and by November 30, 2021, Biologyx owned Celularity roughly $1.2 million in outstanding payments. Celularity SUF ¶¶ 41–42.

Also in late November, one of the MACs administering Part B, Noridian, put a hold on processing a category of medications that included Interfyl. *See id.* ¶ 43; D.E. 95-32 ("April 2022 Emails"). Biologyx thus informed Celularity in an email on December 3, 2021, that it could not "continue to ship product to providers in that MAC until [that] [was] resolved as it w[ould] only exacerbate AR risk and collection concerns." Celularity SUF ¶ 43 (quoting D.E. 95-21). Even with these issues, Biologyx requested, in that same email, more inventory of Interfyl to sell. *See id.*

And Biologyx continued to purchase more Interfyl after the occurrence of that reimbursement issue, including the purchases for which Celularity now seeks to recover payment. *See id.* ¶¶ 46, 49, 52–53. The first such order was released on December 15, 2021, was due in March 2022, and was for $578,200 worth of Interfyl. *See id.* ¶ 46 (citing, *e.g.*, D.E. 95-22 ("December 15 Interfyl Invoice")). On January 14, 2022, however, Celularity informed Biologyx that it could not release orders to Biologyx unless Biologyx cleared up some of its outstanding balances, and Biologyx responded that it would soon be sending a wire—which it did on January 26, 2022, when it wired Celularity $200,000. *Id.* ¶¶ 47–48, 51. On January 18, 2022, Celularity

5

released the second order at issue here, an order of $144,200 worth of Interfyl, with payment due on March 19, 2022.  *Id.* ¶ 49 (citing D.E. 95-23 ("January 18 Interfyl Invoice")).  Celularity then released the other two orders at issue on January 19, 2022, and January 28, 2022: (1) the January 19 order for $130,000 worth of Interfyl, with payment due on March 28, 2022, *id.* ¶ 52 (citing D.E. 95-24 ("January 19 Interfyl Invoice")), and (2) the January 28 order for $910,000 worth of Interfyl, with payment due on March 29, 2022, *id.* ¶ 53 (citing D.E. 95-25 ("January 28 Interfyl Invoice") (together with the December 15 Interfyl Invoice, the January 18 Interfyl Invoice, and the January 19 Interfyl Invoice, the "Interfyl Invoices").  The Interfyl Invoices totaled $1,762,400.  *Id.* ¶ 46.

Then, on February 2 and 16, 2022, CMS issued Technical Direction Letters ("TDLs") instructing the MACs to automatically deny Part B payments for claims of amniotic products like Interfyl and providing the MACs with specific instructions on how to deny claims.  Biologyx SUF ¶¶ 37–38.  But on March 25, 2022, CMS issued another TDL rescinding the February 2022 TDLs regarding amniotic products and required a claim-by-claim review.  *Id.* ¶ 39.

Meanwhile, although the parties were discussing these reimbursement issues in February and March and their impact on forecasting for placing orders moving forward, *see, e.g.*, D.E. 96-21, there is no evidence that Biologyx informed Celularity that it could not pay the Interfyl Invoices that would be coming due in mid-to-late March.

And on February 28, 2022, Biologyx placed an order for $833,000 worth of Biovance—a different Celularity product.  Celularity SUF ¶ 54 (citing D.E. 95-29 (the "Biovance Invoice")).[9]

---

[9] Biologyx maintains that it made this purchase only after Celularity agreed to cure the Interfyl reimbursement issues (including those caused by the Noridian and CMS directives).  *See* Biologyx SUF ¶ 65.  Celularity disputes that.  *See* D.E. 106-1 ("Response to Biologyx SUF") ¶ 65.  The parties' dispute regarding the relationship between this Biovance purchase and the Agreement/Interfyl reimbursement issues is discussed further *infra* Section III.C.1.

In March 2022, although the parties continued to dismiss reimbursement issues with Interfyl, they also continued to discuss payments for the outstanding invoices (mostly those predating the Interfyl Invoices), and on March 21, 2022, Biologyx wired Celularity $400,000. *See* Celularity SUF ¶¶ 56–57. This wire partially covered the outstanding Interfyl Invoices, bringing the $1,762,400 Interfyl balance down to $1,532,050. *See id.* ¶ 59. After making that payment, Biologyx continued to promise Celularity that it would pay the entire Interfyl balance. *See* D.Es. 95-30 (March 17, 2022, email from Biologyx to Celularity stating that Saab was "closing [his] business financing the second week of April at which point [Biologyx] intend[ed] to get current"); 95-31 (March 20, 2022, email from Biologyx to Celularity stating it would make a payment).

On April 12, 2022, Celularity's Executive Vice President and Chief Operating Officer John Haines had a call with Saab, during which, as characterized by Haines in an email later that afternoon, they agreed that Biologyx would pay the full amount of the past due Interfyl Invoices by April 29, 2022, and discussed the Biovance Invoice coming due that day. *See* April 2022 Emails.

Saab responded with two emails on April 19, 2022. *Id.* In the first, he outlined a series of "challenges" he stated "created and continue[d] to create Force Majeure events by the terms of [the Agreeent] that must be cured by Celularity, and [Biologyx] cannot be held liable for non-performance or delay in performance as a result [of] the Force Majeure events existing." *Id.* These "challenges" included the issues with Noridian and the CMS TDLs regarding denial of Part B amniotic product claims, as well as a new issue that arose on April 14, 2022, in connection with a different MAC (Novitas) proposing to deny coverage for a certain use of Interfyl. *See id.* Saab went on to list actions he asserted Celularity was required to take to "clear up these regulatory challenges," including: (1) "[s]ubmission to the FDA to confirm the 2004 RFD for Interfyl" or

"[a]lternatively, [t]hat a new RFD . . . be issued for the product," (2) "[f]ollowing receipt of the FDA confirmation of the 2004 RFD," that Celularity "obtain confirmation from CMS national that the product will be reimbursed under the injection policies and wound care policies," and (3) that Celularity "contest the proposed LCD [local coverage determination] from Novitas/First Coast (and any other LCDs from other MACs that may follow) and getting Interfyl on the approved list of reimbursed products in the wound care space (and injectable space should any MACs issue non-coverage LCDs)." *Id.*

Saab then sent a follow-up email on April 19 addressing the payment issues raised in Haines's initial email. *See id.* In that email, Saab stated, among other things, that the existence of a force majeure event "allow[ed] pause on the forecast and corresponding purchase commitment to preserve exclusivity in the Medicare Part B space until those items [were] rectified in full or otherwise adjusted depending on the outcome of the regulatory dispute," but was "not intended to draw a pause on past product purchases . . . ." *Id.* With respect to the Biovance Invoice, Saab explained that "as the market for that product remain[ed] open, the balance for that product would be paid" and further that he "believe[d] that balance [was] roughly $883,000 which . . . [he would] have when [he] close[d] [his] financing. *Id.*[10]

On May 3, 2022, Dr. Brigido of Celularity emailed Saab requesting an update on his financing and providing Celularity's own update regarding conversations with the FDA and CMS regarding the Interfyl reimbursement issues Saab had mentioned in his first April 19 email. Celularity SUF ¶¶ 63–65 (quoting and citing D.E. 95-33). Saab responded on May 5, 2022, that he was still awaiting the financing. *Id.* ¶ 67; D.E. 95-33.

---

[10] *See infra* Section III.C.2.b for a closer analysis of this statement regarding the Biovance Invoice.

Ultimately, Biologyx never made another payment to Celularity, with the Biologyx's March 21, 2022, payment becoming its last payment. *See* Celularity SUF ¶ 57. On March 13, 2023, Celularity sent Biologyx a "Notice of Breach of Supply and Distribution Agreement and Final Demand for Payment" demanding payment of the outstanding Interfyl Invoices and Biovance Invoice or the Agreement would automatically terminate within 30 days. *Id.* ¶ 72 (citing D.E. 95-39 ("Notice of Breach")). Biologyx did not respond or make payment. *See id.* ¶ 73. Celularity then sent the Biologyx a "Notice of Termination" of the Agreement on April 13, 2023, pursuant to § 9.2 of the Agreement (the "Termination Provision"). *See id.* (citing D.E. 95-40 ("Termination Notice")).

Several months after the Notice of Termination, Celularity launched Biovance 3L. *See* D.E. 96-2 ("Saab Declaration") ¶¶ 36–37.[11]

## B.    Procedural History

Celularity filed a nine-count Complaint against Biologyx, Saab, and Encyte, LLC ("Encyte")[12] on April 17, 2023. Biologyx, Saab, and Encyte moved to dismiss the Complaint on July 7, 2023, but that first motion to dismiss was administratively terminated for failure to comply with the undersigned's preferences. *See* D.Es. 12 & 13. After the parties appropriately filed the pre-motion conference letters required by the undersigned's preferences and the Court permitted the motion to move forward, *see* D.Es. 15–17, Biologyx, Saab, and Encyte filed a proper motion to dismiss on July 31, 2023, D.E. 18-1 ("Motion to Dismiss").

---

[11] Biologyx's argument that it would have had the right of first offer to Biovance 3L pursuant to the Agreement had it not been wrongfully terminated is addressed *infra* Section III.B.2.a.iv.

[12] Encyte is not party to the Agreement but was named in the Complaint because it shares a corporate principal and principal place of business with Biologyx and advertises itself as Biologyx's partner. *See* D.E. 38 ("Motion to Dismiss Opinion").

On February 8, 2024, the Court granted in part and denied in part the Motion to Dismiss. Motion to Dismiss Opinion & D.E. 39 ("Motion to Dismiss Order"). In doing so, the Court first determined that Delaware law should be applied to Celularity's breach of contract and implied covenant of good faith and fair dealing claims, whereas New Jersey law should be applied to Celularity's quasi-contractual and tort claims. Motion to Dismiss Opinion at 6–7. The Court then dismissed all of the claims as brought against Encyte and Saab. *Id.* at 8–13. The Court further dismissed Celularity's good faith and fair dealing, fraudulent inducement, and conversion claims as brought against Biologyx, as well as Celularity's request for attorneys' fees and costs. *Id.* at 14–19. The Court, however, declined Biologyx's invitation to dismiss Celularity's quasi-contractual claims as brought against Biologyx. *Id.* at 14.[13]

As the last defendant standing, Biologyx filed its Answer to Celularity's remaining claims and its Counterclaim on April 4, 2024. Celularity answered the Counterclaim on April 25, 2024. D.E. 46 ("Answer to Counterclaim").

Although the parties had already begun discovery while the Motion to Dismiss was pending, *see, e.g.*, D.E. 20, Biologyx suggested additional limited written discovery on its Counterclaim, which the Hon. Leda D. Wettre, U.S.M.J., permitted in an amended scheduling order, D.E. 45. After extending fact discovery twice more, Judge Wettre extended it for the final time on January 7, 2025, setting the final fact discovery deadline as February 28, 2025. *See* D.Es. 51, 57, 63. On March 4, 2025, however, Biologyx again sought an extension of the fact discovery deadline to obtain specific information it claimed was relevant to its Counterclaim. *See* D.Es. 76 ("Extension Request") & 77 ("Extension Motion"). In deciding the Extension Motion on April

---

[13] Biologyx did not move to dismiss Celularity's breach of contract (Count I of the Complaint) or account stated (Count VII of the Complaint) claims. *See generally* Motion to Dismiss.

2, 2025, Judge Wettre ultimately permitted Biologyx "to use any documents produced in response to third-party subpoenas served during the fact discovery period in subsequent phases of this litigation," but denied Biologyx's: (1) "request for an extension of fact discovery in order to depose" "non-party John McInnes, an attorney who represented plaintiff with respect to regulatory affairs" and (2) request to reopen fact discovery to allow Biologyx "to obtain responses to its February 26, 2025[,] supplemental document requests."   D.E. 82 ("Order Denying Discovery Extension").  Biologyx then appealed Judge Wettre's Order Denying Discovery Extension, D.E. 84 ("Discovery Extension Appeal"), but the undersigned denied the Discovery Extension Appeal and affirmed the Order Denying Discovery Extension, D.E. 109 ("Order Denying Appeal").

While the Discovery Extension Appeal was pending, the parties filed the instant Motions. Celularity moved for summary judgment on its breach of contract (Count I of the Complaint) and account stated (Count VII of the Complaint) claims, as well as on Biologyx's breach of warranty (Counts Two, Three, and Four of the Counterclaim), quasi-contractual (Counts Six and Seven of the Counterclaim), and fraud (Count Eight of the Counterclaim) counterclaims and Biologyx's request for certain types of damages.  *See* Celularity MSJ.  In support of its Motion for Partial Summary Judgment, Celularity also submitted its SUF and various exhibits (D.Es. 95-3–42). Biologyx opposed Celularity's Motion for Partial Summary Judgment and cross-moved to amend its Counterclaim.  Opp. to Celularity MSJ.  Biologyx also filed its Response to Celularity's SUF, various exhibits (D.E. 104-3), a declaration under Federal Rule of Civil Procedure 56(d) (D.E. 103-2 ("56(d) Declaration")), and its Cross-Motion to Amend.  Celularity replied in support of its Motion for Partial Summary Judgment and opposed Biologyx's Cross-Motion to Amend. Celularity Reply.

Biologyx simultaneously moved for summary judgment on all of Celularity's remaining claims (the breach of contract, quasi-contractual, and account stated claims brought in Counts I, II, IV, V, and VI of the Complaint), as well as on its own breach of contract (Count One of the Counterclaim), breach of warranty (Counts Two, Three, and Four of the Counterclaim), and good faith and fair dealing (Count Five of the Counterclaim) counterclaims. Biologyx MSJ. In support of its Motion for Partial Summary Judgment, Biologyx filed its SUF, the Saab Declaration, and various exhibits (D.Es. 96-5–39). Celularity opposed Biologyx's Motion for Partial Summary Judgment, Opp. to Biologyx MSJ, and submitted its Response to Biologyx's SUF and more exhibits (D.Es. 106-2–29). Biologyx replied in support of its Motion for Partial Summary Judgment, Biologyx Reply, and filed an additional exhibit (D.E. 107-1).

## II.    LEGAL STANDARD

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and to identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmoving party bears the burden of proof on an issue, the moving party's initial burden can be met simply by

12

"pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment," *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002), as are unsworn statements in memoranda and unsupported statements in pleadings, *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).

## III.   ANALYSIS

Celularity's claims and Biologyx's counterclaims revolve around three different medications: (1) Interfyl, (2) Biovance 3L, and (3) Biovance. While certain causes of action involve more than one of these medications, the Court analyzes the claims related to Interfyl and Biovance 3L together and then those related to Biovance separately because those Biovance-related claims require resolving different contractual questions.

13

Having analyzed those claims accordingly, the Court will **GRANT in part** and **DENY in part** both Celularity's Motion for Partial Summary Judgment and Biologyx's Motion for Partial Summary Judgment. The Court will further **DENY** Biologyx's Cross-Motion to Amend its Counterclaim as **MOOT** and **DISMISS** Biologyx's counterclaim for breach of the covenant of good faith and fair dealing in Count V of the Counterclaim.

Before turning to those claims, however, the Court will address—and reject—Biologyx's argument that Celularity's Motion for Partial Summary Judgment should be denied under Federal Rule of Civil Procedure 56(d).

### A.    Biologyx's Invocation of Federal Rule of Civil Procedure 56(d)

Under Federal Rule of Civil Procedure 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

Here, Biologyx has submitted its 56(d) Declaration arguing that Celularity did not comply with its discovery obligations over the course of this action and that Celularity did not produce "many documents" relevant to Celularity's Motion for Partial Summary Judgment. *See* 56(d) Declaration. Biologyx, however, only actually identifies two supposedly missing categories of documents: (1) meeting minutes of the Celularity board and (2) certain financial information for Interfyl, Biovance, and Biovance 3L. *See id.* ¶¶ 21–22. Neither counsels denying Celularity's Motion for Partial Summary Judgment on Rule 56(d) grounds.

*First*, since the parties finished briefing the Motions, the Court has denied Biologyx's Discovery Extension Appeal, in which Biologyx appealed Judge Wettre's decision not to re-open discovery to permit Biologyx to obtain the very financial information Biologyx claims it required to oppose Celularity's Motion for Partial Summary Judgment. *See* Order Denying Appeal at 7–

14

12.  Because the Court has already ruled that Biologyx is not entitled to said financial information, the Court therefore declines to deny Celularity's Motion for Partial Summary under Rule 56(d) on the basis that Celularity refused to produce that financial information.

*Second*, and relatedly, the Court finds that the unproduced board minutes do not warrant denial of Celularity's Motion for Partial Summary Judgment, either.  As outlined in part in the Court's Order Denying Appeal, *see id.* at 2–5, Biologyx had ample opportunity to raise issues related to these board minutes during the long discovery process ably managed by Judge Wettre.  Discovery closed in February 2025, after the parties had engaged in discovery for over a year, *see id.* at 3–4, and had raised numerous discovery disputes before Judge Wettre.  *See, e.g.*, D.Es. 64, 73, 76.  In fact, Biologyx did raise the non-production of the board minutes in a letter to Judge Wettre on February 4, 2025.  D.E. 64.  But Biologyx never filed a motion to compel nor took any other action with respect to these board minutes.  *See* Dkt.  Instead, Biologyx chose to focus on the financial information it also sought and file its Extension Motion to obtain that information.  Biologyx's 56(d) Declaration does not even attempt to explain why it did not take any similar action with respect to the board minutes.  *See* 56(d) Declaration.  The Court will not second guess Biologyx's own choice to focus on the financial information, nor will it now allow Biologyx to use Rule 56(d) to circumvent the discovery process carefully managed by Judge Wettre to, belatedly, and improperly, get a second bite at the apple with respect to the board minutes.  *See, e.g.*, *Walter v. Travelers Pers. Ins. Co.*, No. 12-346, 2016 WL 6962620, at *8 (M.D. Pa. Nov. 29, 2016) (declining to deny summary judgment motion where the Rule 56(d) declaration was "made months after discovery closed and more than four years after the case was filed" and "the parties ha[d] repeatedly litigated discovery issues," finding that arguments in the declaration were "little more than a last-ditch effort to delay . . . proceedings under the rubric of having failed to obtain

15

discovery months ago . . . and . . . not persuasive"); *see also Koplove v. Ford Motor Co.*, 795 F.2d 15, 18 (3d Cir. 1986) ("Movant under Rule 56([d]) must have used discovery mechanisms in timely fashion" (citing *Walters v. Ocean Springs*, 626 F.2d 1317, 1321–22 (5th Cir. 1980) (per curiam)).

The Court will accordingly decline Biologyx's invitation to deny Celularity's Motion for Partial Summary Judgment under Rule 56(d).

### B.      Claims Related to Interfyl and Biovance 3L

The Court now turns to the parties' substantive arguments regarding Interfyl and Biovance 3L, which constitute the bulk of the parties' Motions.

Celularity argues that Biologyx breached the Agreement when it failed to pay for $1,466,250 worth of Interfyl it had purchased. *See* Celularity MSJ at 1. Biologyx counters that a Force Majeure event (Part B reimbursement issues) suspended its performance obligations and further that in fact Celularity is the one in breach because Celularity failed to ensure that Interfyl was reimbursed through Part B as required by the Agreement and then wrongfully terminated the Agreement—which impacted Biologyx's rights to both Interfyl and Biovance 3L. *See* Biologyx MSJ at 1. Celularity, in turn, denies that it had an obligation to ensure that Interfyl was reimbursed through Part B (and argues that, if anyone, it was Biologyx that had such an obligation), contends that Biologyx did not properly invoke the Suspension Force Majeure Provision in the Agreement, and denies that it wrongfully terminated the Agreement. *See* Opp. to Biologyx MSJ at 3–20, 24–30. Both parties also bring quasi-contractual claims based on the Interfyl-related conduct described above. *See id.* at 3–22; Opp. to Celularity MSJ at 5–7, 24–26.

In addition to its quasi-contractual and contract counterclaims, Biologyx further brings breach of warranty counterclaims related to Interfyl, as well as breach of the implied covenant of good faith and fair dealing and fraud counterclaims related to both Interfyl and Biovance 3L. *See*

16

Counterclaim ¶¶ 123–66, 179–83. These counterclaims are all also closely tied to the reimbursement issues and the parties' obligations under the Agreement.

Because the Court's analysis of each of the Interfyl- and/or Biovance-related claims accordingly requires determining the parties' obligations under the Agreement, the Court starts there. The Court then applies its interpretation of the Agreement to each of the those claims brought by the parties.

As outlined below, applying its interpretation of the relevant provisions in the Agreement to those claims, the Court will **GRANT** Celularity's Motion for Partial Summary Judgment as to the parties' breach of contract claims in Count I of the Complaint and Count One of the Counterclaim to the extent that Biologyx: (1) argues that Celularity's failure to comply with a general obligation to ensure Interfyl was reimbursed through Part B excused Biologyx's nonperformance, (2) brings an affirmative claim for breach of contract based on the Suspension Force Majeure Provision, (3) asserts a force majeure affirmative defense to Celularity's breach of contract claim, and (4) seeks to bring any wrongful termination breach of contract counterclaims. The Court will also **GRANT** Celularity's Motion for Partial Summary Judgment as to: (1) Biologyx's unjust enrichment counterclaim (Count Six of the Counterclaim) and quantum meruit counterclaim (Count Seven of the Counterclaim), (2) Biologyx's breach of warranty counterclaims (Counts Two, Three, and Four of the Counterclaim), and (3) Count Eight of the Counterclaim to the extent it brings fraud counterclaims based on representations inducing the purchase of Interfyl. The Court will further **DISMISS** Biologyx's counterclaim for breach of the covenant of good faith and fair dealing in Count V of the Counterclaim.

The Court will, however, **DENY** Celularity's Motion for Partial Summary Judgment as to the parties' breach of contract claims in Count I of the Complaint and Count One of the

Counterclaim to the extent Celularity argues that it was not in breach of its Government Action Force Majeure Obligations.

As for Biologyx's Motions, the Court will **DENY** Biologyx's Cross-Motion to Amend its Counterclaim as **MOOT**.  The Court will also **DENY** Biologyx's Motion for Partial Summary Judgment as to the parties' breach of contract claims in Count I of the Complaint and Count One of the Counterclaim to the extent Biologyx (1) argues that Celularity's failure to comply with a general obligation to ensure Interfyl was reimbursed through Part B breached the Agremeent, (2) asserts a force majeure affirmative defense to Celularity's breach of contract claim, (3)  contends Celularity breached its Government Action Force Majeure Obligations, and (4) seeks to bring any wrongful termination breach of contract counterclaims.  The Court will further **DENY** Biologyx's Motion for Partial Summary Judgment as to its (1) breach of warranty counterclaims (Counts Two, Three, and Four of the Counterclaim), and (2) breach of the covenant of good faith and fair dealing counterclaims in Count V of the Counterclaim.  The Court will, however, **GRANT** Biologyx's Motion for Summary Judgment as to Celularity's quasi-contractual claims in Counts III, IV, and V of the Complaint to the extent they are brought in connection with Interfyl purchases.

> 1.    *Interpretation of the Agreement's Part B reimbursement provisions*

As it did at the motion to dismiss stage, the Court interprets the Agreement under Delaware law, given that the Agreement provides that Delaware law governs and neither party disputes the validity of that choice of law provision.  *See* Motion to Dismiss Opinion at 6 (quoting Agreement § 12.8).

Under Delaware law, "[t]he starting point in construing any contract is to determine whether a provision is ambiguous, i.e., whether it is *reasonably* subject to more than one interpretation."  *Matulich v. Aegis Commc'ns Grp., Inc.*, 942 A.2d 596, 600 (Del. 2008).  A provision is not, however, "rendered ambiguous simply because the parties in litigation differ

18

concerning its meaning." *Id.* (quoting *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)). Contract construction under Delaware law is an objective inquiry, with courts focusing not on "what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (citing *Steigler v. Ins. Co. of N. Am.*, 384 A.2d 398, 401 (Del. 1978)). Accordingly, "courts interpreting a contract "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)). "The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan." *GMG Cap.*, 36 A.3d at 779.

Here, the parties each point to a set of provisions in the Agreement they maintain support their proffered interpretation of their obligations under the same. But, in doing so, each party takes an improperly myopic view. Construing the Agreement as a whole—as the Court must under Delaware law—the Court reaches the following four conclusions regarding the Part B reimbursement-related provisions in the Agreement on which it elaborates below: (1) the Agreement does not obligate either Celularity nor Biologyx to ensure that Interfyl remains reimbursed by Part B; (2) both Celularity and Biologyx were obligated to take certain actions if government action created a "Force Majeure event under [the] Agreement (e.g., . . . CMS or any Medical Administrative Contractor determining or issuing a local policy or local coverage determination that [Interfyl] will not be reimbursed under Medicare Part B or reimbursed at a lesser amount)," Government Action Force Majeure Obligations; (3) both Biologyx and Celularity were

19

permitted to delay or suspend performance of the Agreement if that delay or suspension was caused by a reimbursement-related Force Majeure event; and (4) either party was permitted to terminate the Agreement under certain circumstances.

           a.        <u>General obligations to ensure Interfyl was reimbursed by Part B</u>

Biologyx suggests that the Agreement allocated to Celularity the responsibility of ensuring that Interfyl continued to be reimbursed under Part B. *See* Opp. to Celularity MSJ at 9. Celularity, for its part, maintains that Biologyx—not Celularity—was allocated the general reimbursement-related responsibilities under the Agreement and that Celularity was only obligated to address reimbursement issues if a reimbursement-related force majeure event occurred. *See* Celularity MSJ at 10–16; Opp. to Biologyx MSJ at 11–21. The Court agrees with Celularity that Biologyx's proposed reading of the provisions of the Agreement cannot be squared with the Agreement as a whole. The Court further finds that the Agreement cannot reasonably be construed as assigning either party that responsibility.

Biologyx's interpretation of Celularity's obligations with respect to Interfyl reimbursement primarily rests on four contractual provisions: (1) § 11.1(b), which sets forth some of Celularity's obligations under the Agreement; (2) § 11.1(c), which discusses more of Celularity's obligations, (3) § 10.1(b), which outlines an express warranty in the Agreement; and (4) § 1.22, which aids in defining the scope of the Agreement. *See* Opp. to Celularity MSJ at 16–19. These provisions state as follows:

§ 11.1    Obligations of Celularity

    (b)  Celularity will be responsible for development, manufacturing, testing, quality, control, supply distribution, regulatory approvals and clearances necessary for the Manufacture and shipping of the Product
. . . .

    (c)  During the Term, Celularity shall manufacture the Products, and otherwise fulfill its obligations under this Agreement, in accordance

> with applicable laws and regulations, and the applicable standards of the AABB and AATB.  In addition, Celularity shall cause throughout the term obtain and maintain applicable certifications, permits and all other required state and local regulatory approvals.

> § 10.1   Each Party hereby represents and warrants to the other Party as of the Effective Date as follows:

>> (b)  All necessary consents, approvals and authorizations of all regulatory and governmental authorities required to be obtained by such Party in connection with the execution and delivery of this Agreement and the performance of its obligations hereunder have been obtained.

> § 1.22   **"Field"** means any application within a medical specialty where the Product is administered in an in-office or in-patient setting and is reimbursed through Medicare Part B . . . .

Agreement §§ 11.1(b), (c), 10.1(b), 1.22.  Biologyx maintains that, together, these provisions require Celularity to ensure that Interfyl was reimbursed by Medicare Part B because the Agreement is for distribution in the Field—which is defined to only include the sale of Interfyl reimbursed through Part B—and because Celularity is required to maintain regulatory approvals—which Biologyx argues includes reimbursement through Part B.  *See* Opp. to Celularity MSJ at 16–19.

Celularity responds that the Agreement only requires it to maintain "regulatory approvals and clearances necessary for the Manufacture and shipping of the Product," Agreement § 11.1(b), and further argues that no law or regulation required it to have any sort of approval for Part B reimbursement.  *See* Opp. to Biologyx MSJ at 9–11.

As an initial matter, the Court agrees with Biologyx that the Agreement does not, as Celularity argues, limit Celularity's regulatory approval obligations to those strictly related to the manufacture and shipping of Interfyl.  § 11.1(c) of the Agreement plainly expands Celularity's regulatory approval obligations beyond those directly related to manufacturing and shipping, when

21

it—untethered to any sort of limiting clause—states that Celularity must "obtain and maintain applicable certifications, permits and all other required state and local regulatory approvals." The Court is, however, unconvinced that ensuring that Interfyl is reimbursed through Part B constitutes a "required state [or] local regulatory approval[]." While it is true that "Regulatory Approval" is defined to include "pricing and reimbursement approvals," *see* § 1.37, it is not clear that any law or regulation actually requires a specific sort of reimbursement approval. Nor is it clear that a definitive sort of reimbursement approval exists. There is no dispute, for instance, that CMS directed case-by-case review of Part B reimbursement requests in March 2022. *See* Biologyx MSJ at 10–11; Opp to Biologyx MSJ at 14–15. It strains credulity to construe case-by-case reimbursement decisions as a "regulatory approval" Celularity is obligated to maintain.[14] If no such approval is "require[d]" under § 11.1(c), then Biologyx's argument that said provision obligates Celularity to maintain Interfyl's reimbursement status fails.

Moreover, construing § 11.1(c) as imposing such an obligation on Celularity is inconsistent with the Agreement as a whole. As Celularity points out, the Agreement allocates commercialization responsibilities to Biologyx and explicitly provides that those commercialization responsibilities include "negotiating with applicable Governmental Authorities regarding the price and reimbursement status of each Product . . . ." Agreement § 5.1(b); *see* Celularity MSJ at 15. The plain text of § 5.1(b) simply cannot be squared with Biologyx's strained interpretation of Celularity's obligations under § 11.1(c). Consistent with § 5.1(b), a review of the entire Agreement reveals that its overall scheme is to impose customer-facing and sales

---

[14] It appears that there are some CMS coverage determinations that could more reasonably be construed as a type of regulatory approval. But because some reimbursement decisions are made case-by-case, the Court cannot read § 11.1(c) as imposing the far-reaching obligation to ensure that *all* Part B reimbursement requests are approved—which is what Biologyx's interpretation of § 11.1(c) compels.

responsibilities on Biologyx as the distributor of Interfyl and manufacturing and shipping responsibilities on Celularity as the manufacturer thereof. *See generally* Agreement. And, even accepting that regulatory approvals may include certain types of reimbursement approvals, the Agreement allocates nearly all of the responsibilities involving "Regulatory Matters" to *Biologyx*—not Celularity. *See* Agreement § 8.1–6. Biologyx is, for instance, charged with drafting regulatory filings, notifying Celularity of regulatory materials it submits to or receives from regulatory authorities, and setting up meetings and discussions with regulatory authorities (which Celularity may attend at its own expense only if permitted by the relevant regulatory authority). *See id.* § 8.2. Biologyx's proposed inference from § 11.1(c)—in conjunction with the few other isolated provisions it cites—that Celularity is required to essentially guarantee Interfyl's reimbursement status therefore "cannot control" because "such inference runs counter to the agreement's overall scheme or plan"—which allocates Biologyx the commercialization responsibilities as well as the vast majority of the regulatory responsibilities. *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

But what it perhaps most fatal to Biologyx's construction of Celularity's general reimbursement-related obligations is that it conflicts with Biologyx's own proffered interpretation of the force majeure-related provisions on which Biologyx's defenses and counterclaims so heavily rely. As described further *infra* Section III.B.1.b–c, there are two categories of relevant force majeure provisions in the Agreement. The first, the Suspension Force Majeure Provision, allows a party to suspend or delay performance due to "an Event of Force Majeure." Agreement § 12.5. "Force Majeure," in turn, is defined as "conditions beyond the reasonable control of the Parties . . . ." *Id.* § 1.24. The second set, the Government Action Force Majeure Obligations, require both Celularity and Biologyx to "commit sufficient resources by which to dispute, contest

23

and reverse [a] Governmental Authority action that would eliminate [a] Force Majeure event" created by that Governmental Authority action, including "CMS or any Medical Administrative Contractor determining or issuing a local policy or local coverage determination that the Products will not be reimbursed under Medicare Part B or reimbursed at a lesser amount." *Id.* §§ 11.1(i), 11.2(i). If a Force Majeure event must be "beyond the reasonable control of the Parties" and the denial of Part B reimbursement requests based on a CMS policy (or based on other reasons) constitutes a Force Majeure event—as Biologyx claims it does, then the Agreement cannot also generally require Celularity to ensure that Interfyl is reimbursed by Part B. The same outcome (Interfyl being reimbursed by Part B) cannot be both beyond a party's reasonable control and something the Agreement requires the party to achieve. What's more, the Agreement requires *both* Celularity *and* Biologyx to attempt to reverse government action (like a reimbursement policy) creating a Force Majeure event (like an attendant lack of reimbursement). *See* Government Action Force Majeure Obligations. Obligating Biologyx to make such efforts is wholly inconsistent with reading the Agreement to require only Celularity to ensure reimbursement of Interfyl under Part B.

Given that Biologyx overreads the provisions it claims impose on Celularity the obligation to ensure that Inferfyl is reimbursed under Part B—both when viewed in isolation and in the context of the Agreement as a whole, Biologyx's interpretation of those provisions is therefore not reasonable and must be rejected. *See, e.g.*, *2009 Caiola Fam. Tr. v. PWA, LLC*, No. 8028-VCP, 2014 WL 1813174, at *9–11 (Del. Ch. Apr. 30, 2014) (rejecting a party's proposed interpretation of relevant contractual provision where it was inconsistent with the contract as a whole and "would lead to arguably absurd results").

24

Instead, based on the foregoing analysis, the Court concludes that the Agreement unambiguously leaves unallocated to either party the ultimate responsibility of ensuring Interfyl is reimbursed by Part B.  That is not to say, however, that neither party is required to take any action connected to Interfyl's reimbursement.  In fact, as mentioned above and as explored in more depth *infra* Section III.B.1.b, the Agreement explicitly requires *both* Celularity and Biologyx to act, at minimum, when government action threatens Interfyl's reimbursement status at a large scale.  *See* Government Action Force Majeure Obligations.  But, while it informs the interpretation of the Agreement's general reimbursement-related provisions, what the Agreement requires *after* a Force Majeure event related to reimbursement remains distinct from the question of whether the Agreement *separately* obligates any particular party to ensure that Interfyl remains reimbursed through Part B (as Biologyx suggests).  And the Court here answers that question in the negative.

b.    Government Action Force Majeure Obligations

As previewed above, the Agreement contains provisions setting forth Celularity's and Biologyx's obligations in the event a governmental authority takes an action creating a Force Majeure event.  Specifically, the Agreement provides:

> In the event any Governmental Authority[15] takes action that creates a Force Majeure event under this Agreement (e.g., FDA limiting indications for use of the Product or determining the Product is not a 361 Human Celular [sic] Tissue Product, or CMS or any Medical Administrative Contractor determining or issuing a local policy or local coverage determination that the Products will not be reimbursed under Medicare Part B or reimbursed at a lesser amount), then [Celularity and Biologyx] shall commit sufficient resources by which to dispute, contest and reverse such Governmental Authority action that would eliminate the Force Majeure event.

*Id.* § 11.1(i) (imposing obligation on Celularity), § 11.2(i) (imposing obligation on Biologyx).

---

[15] "Governmental Authority" is broadly defined to include "any multinational, federal, state, local, municipal, provincial or other governmental authority of any nature (including any governmental division, prefecture, subdivision, department, agency, bureau, branch, office, commission, council, court or other tribunal)."  Agreement § 1.26.

25

The Court need not further interpret these Government Action Force Majeure Provisions, as their plain meaning is clear and the parties do not disagree over their meaning (just their application—which is discussed *infra* Section III.B.2.a.iii).

c.    Suspension Force Majeure Provision

More complicated is the Suspension Force Majeure Provision in the Agreement. Biologyx claims that it was entitled to suspend performance of the Agreement because denial of Interfyl reimbursements created a Force Majeure event. *See* Biologyx Reply at 3–5. Celularity responds that Biologyx failed to properly invoke the Force Majeure provision allowing suspension or delay in performance and therefore cannot rely on that provision to justify its suspension of performance. *See* Opp. to Biologyx MSJ at 4–9. Biologyx, in turn, urges the Court to reject that argument, contending that the relevant Force Majeure provision does not actually require Biologyx to "invoke" that provision to suspend performance. *See* Biologyx Reply at 3–5.

The Court need not, however, resolve this issue here. That's because, as detailed *infra* Section III.B.2.a.ii, the Court ultimately finds that Biologyx has not demonstrated that its actions fall under the Suspension Force Majeure Provision because it has not shown that its suspension of performance was caused by a Force Majeure Event. The Court therefore need not interpret this provision any further and will simply set forth below the language of the provision and the law applicable to interpreting it.

Under Delaware law, "application of a force majeure provision, as with any other contractual provision, starts with the words chosen by the drafters." *Stroud v. Forest Gate Dev. Corp.*, No. 20063, 2004 WL 1087373, at *5 (Del. Ch. May 5, 2004). § 12.5 of the Agreement, titled "Force Majeure," provides:

> Neither Party shall be liable *for non-performance or delay in performance caused by an Event of Force Majeure*. The non-performing Party shall notify the other

26

Party of such event of Force Majeure within seven (7) days after such occurrence by giving written notice to the other Party stating the nature of the event, its anticipated duration, and any action being taken to avoid or minimize its effect. The suspension of performance shall be of no greater scope and no longer duration than is necessary and the non-performing Party shall use, throughout the period of suspension of performance, commercially reasonable efforts to remedy its inability to perform; provided, however, that in the event the suspension of performance continues for ten (10) days after the date such Force Majeure commences, the Parties shall meet to discuss in good faith how to proceed in order to carry out the intent of this Agreement.  For purpose of this Agreement a Force Majeure shall not include: (i) a Party's failure to commit sufficient resources, financial or otherwise, to its activities under this Agreement, or (ii) general market or economic conditions.

Suspension Force Majeure Provision (emphasis added).    The Court applies this language to Biologyx's invocation of the Suspension Force Majeure Provision *infra* Section III.B.2.a.ii.

### d.    Termination Provision

Celularity terminated the Agreement on April 13, 2023, Termination Notice, after having served Biologyx with the Notice of Breach on March 13, 2023.  Biologyx contends that this termination was wrongful.  *See* Biologyx MSJ at 21–22.

Under the Agreement, a party thereto is permitted to terminate it in the following circumstances if the following process is undertaken:

(a)    If either Party believes that the other is in material breach of this Agreement, then the Party holding such belief (the "Non-breaching Party") may deliver notice of such breach to the other Party (the "Notified Party").  The Notified Party will have thirty (30) days to cure such breach, or, if cure of such breach other than non-payment cannot reasonably be affected within such thirty (30) day period, to deliver to the Non-breaching Party a plan reasonably calculated to cure such breach within a timeframe that is reasonably prompt in light of the circumstances then prevailing.  Following delivery of such a plan, the Notified Party will devote Commercially Reasonable Efforts to carry out the plan and cure the breach.

(b)    If the Notified Party fails to cure a material breach of this Agreement as provided for in Section 9.2(a), then the Non-breaching Party may terminate this Agreement in its entirety upon written notice to the Notified Party.

Termination Provision.

27

As was the case with the Government Action Force Majeure Obligations, the Court need not further interpret this Termination Provision, as the parties' disputes regarding the termination of the Agreement do not concern the language of this provision.   *See infra* Section III.B.2.a.iv.

> 2.     *Application of the Agreement to the parties' claims related to Interfyl and Biovance 3L*

Having set forth the key contractual provisions bearing on the parties' claims related to Interfyl and Biovance 3L—and resolved the attendant contractual interpretation issues, the Court now applies its interpretation of the Agreement to each of those claims.

> a.     <u>Breach of contract claims related to Interfyl and Biovance 3L (Count I of the Complaint and Count One of the Counterclaim)</u>

The Court starts with the parties' respective breach of contract claims related to Interfyl and Biovance 3L.  Celularity's breach of contract claim regarding Interfyl in Count I of its Complaint and Biologyx's breach of contract counterclaim regarding the same in Count One of its Counterclaim are two sides of the same coin, with each party's claims and defenses to the other party's claims nearly perfectly overlapping.  The Court will therefore discuss them together.

In Count I of its Complaint, Celularity claims that Biologyx breached the Agreement when it failed to pay for $1,466,250 worth of Interfyl it had purchased.  *See* Celularity MSJ at 1. Biologyx does not dispute that it failed to pay for $1,466,250 worth of Interfyl it had purchased. *See* Celularity SUF ¶ 57.  Instead, Biologyx argues that Celularity's contract claim fails because (1) Celularity did not comply with its non-force majeure-related contractual obligations regarding ensuring Interfyl remained covered by Part B, (2) the Suspension Force Majeure Provision allowed Biologyx to suspend performance so there was no breach, (3) Celularity did not comply with its Government Action Force Majeure Obligations once there was a force majeure, and (4) Celularity wrongfully terminated the Agreement for non-payment of the Interfyl balance and to prevent Biologyx from receiving the first right to sell and distribute Biovance 3L.  *See* Opp. to Celularity

28

MSJ at 2–22; Biologyx Reply.  Biologyx also brings its own breach of contract counterclaim in Count One of its Counterclaim for Celularity's failure to comply with the aforementioned contractual obligations.  *See* Biologyx MSJ at 21 ("For the same reasons that Summary Judgment is appropriate to dismiss Celularity's Complaint for Breach of Contract . . . , this Court should grant [Biologyx's] Counterclaim for same.").[16]

Under Delaware law,[17] "the elements of a breach of contract claim are: (1) a contractual obligation, (2) a breach of that obligation by the defendant, and (3) a resulting damage to the plaintiff."  *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) (citation modified).  But "[a] party is excused from performance under a contract if the other party is in material breach thereof."  *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003), *as revised* (Oct. 6, 2003).

The Court reads Biologyx to be arguing that it did not breach the Agreement by not paying for the Interfyl it received from Celularity because performance had been suspended under the Suspension Force Majeure Provision and, even if Biologyx did breach, Celularity itself materially breached by not complying with other obligations under the Agreement and by wrongfully terminating the Agreement—which would require the Court to both reject Celularity's claim for breach and support Biologyx's counterclaim for the same.

As detailed below, the Court will ultimately **GRANT** Celularity's Motion for Partial Summary Judgment to the extent Biologyx (1) argues that Celularity's failure to comply with a

---

[16] *See infra* Section III.B.2.a.iv for a discussion of whether Biologyx did in fact bring a counterclaim for wrongful termination.

[17] As it did at the motion to dismiss stage, the Court analyzes the parties' breach of contract claims under Delaware law, given that the Agreement provides that Delaware governs and neither party disputes the validity of that choice of law provision.  *See* Motion to Dismiss Opinion at 6 (quoting Agreement § 12.8).

general obligation to ensure Interfyl was reimbursed through Part B excused Biologyx's nonperformance, (2) brings an affirmative counterclaim for breach of contract based on the Suspension Force Majeure Provision, (3) asserts a force majeure affirmative defense to Celularity's breach of contract claim, and (4) seeks to bring any wrongful termination breach of contract counterclaims.  The Court will, however, **DENY** Celularity's Motion for Partial Summary Judgment to the extent Celularity argues that it was not in breach of its Government Action Force Majeure Obligations.

As for Biologyx's Motions, the Court will **DENY** Biologyx's Cross-Motion to Amend its Counterclaim as **MOOT** and **DENY** Biologyx's Motion for Partial Summary Judgment to the extent it (1) argues that Celularity's failure to comply with a general obligation to ensure Interfyl was reimbursed through Part B breached the Agremeent, (2) asserts a force majeure affirmative defense to Celularity's breach of contract claim, (3) contends Celularity breached its Government Action Force Majeure Obligations, and (4) seeks to bring any wrongful termination breach of contract counterclaims.

i.    Non-force majeure contractual obligations

The Court first quickly disposes of Biologyx's contention that, even setting aside the force majeure issues, Celularity breached the Agreement by not ensuring that Interfyl was reimbursed through Part B.  *See* Biologyx Reply at 5.  Because the Court has already found that the Agreement did not obligate Celularity to do so, *see supra* Section III.B.1.a, Celularity could not have breached any such obligation.  The Court will accordingly **GRANT** Celularity's Motion for Partial Summary Judgment to the extent Biologyx argues that Celularity's failure to comply with a general obligation to ensure Interfyl was reimbursed through Part B excused Biologyx's nonperformance

and **DENY** Biologyx's Motion for Partial Judgment to the extent Biologyx argues that Celularity's failure to comply with that obligation breached the Agreement.

ii.      Suspension Force Majeure Provision

The Court now turns to Biologyx's argument that it was not required to make the Interfyl payments Celularity now seeks to recover because a Force Majeure event had occurred and Biologyx was therefore permitted to suspend performance under the Suspension Force Majeure Provision.  *See* Biologyx MSJ at 6–13.

While it is not clear that Biologyx is in fact bringing its breach of contract counterclaim based on its invocation of the Suspension Force Majeure Provision, for the avoidance of doubt, the Court first holds that "[a] claim of force majeure excuses performance and defeats a breach of contract claim as an affirmative defense, but it does not give rise to an affirmative claim for breach of contract." *Vita Grp. LLC v. Compass Grp. USA, Inc.*, No. 21-16291, 2022 WL 1261536, at *4 (D.N.J. Apr. 28, 2022).[18]   The Court will therefore **GRANT** Celularity's Motion for Partial Summary Judgment to the extent Biologyx brings an affirmative claim for breach of contract based on the Suspension Force Majeure Provision and **DENY** Biologyx's Motion for Partial Summary Judgment to the same extent.

---

[18] The *Vita* court applied New Jersey law in reaching this conclusion. *See id.* at *3.  The Court is unaware of any Delaware law addressing this issue but is nevertheless convinced by the reasoning articulated in *Vita* and in cases applying Pennsylvania and California law reaching the same conclusion. *See, e.g.*, *Ricoh USA, Inc. v. Innovative Software Sol., Inc.*, No. 20-4025, 2020 WL 7024290, at *8 (E.D. Pa. Nov. 30, 2020) ("We are not aware of authority in which a judge found a force majeure clause gives rise to an affirmative claim for breach of contract."); *Fitness Int'l, LLC v. DDRM Hill Top Plaza L.P.*, No. 21-142, 2021 WL 4497885, at *3 (C.D. Cal. Feb. 25, 2021) ("This claim fails because the force majeure clause only excuses performance of acts required by the Lease.  It cannot form the basis for a standalone breach-of-contract cause of action. (citing Force Majeure clauses, 30 Williston on Contracts § 77:31 (4th ed.))).

The Court now addresses the Suspension Force Majeure Provision in the context of Biologyx's invocation of the same as an affirmative defense to Celularity's breach of contract claim. And, as further explained below, the Court finds that Biologyx's force majeure affirmative defense should be stricken.

The Court begins with the text of the Suspension Force Majeure Provision. The first sentence of that provision reads, "[n]either Party shall be liable for non-performance or delay in performance *caused by* an Event of Force Majeure." Suspension Force Majeure Provision (emphasis added). While the parties spill much ink regarding the notice requirement in the provision, *see supra* Section III.B.1.c, it is the causation language in the first sentence of the provision that begins and ends the Court's inquiry with respect to its applicability at this stage of the proceedings. That's because Biologyx has failed to bring forth sufficient evidence to show that any Force Majeure event *caused* it not to perform its relevant obligation under the Agreement: paying the invoices for the Interfyl it had ordered from Celularity.

Biologyx argues that a Force Majeure event—the denial of Interfyl reimbursement claims under Part B—began on November 30, 2021, and that Biologyx notified the Celularity executive team that reimbursement claims were being denied. *See* Biologyx MSJ at 9; Biologyx SUF ¶ 32. But Biologyx has not brought forth any evidence suggesting that it used the phrase "Force Majeure" and/or mentioned suspending performance due to any reimbursement-related Force Majeure event anytime before Saab wrote the April 2022 Emails to Celularity outlining a list of items he stated had created a Force Majeure. *See* Biologyx SUF ¶ 32 (discussing the claimed occurrence of a Force Majeure event starting in November 2021 but not indicating that Biologyx was unable to pay the outstanding invoices at that point). While they are also related to notice issues, the Court zeroes in here on Biologyx's communications with Celularity regarding its ability

to perform under the Agreement not because they bear on whether Biologyx properly notified Celularity that it was suspending performance under the Suspension Force Majeure Provision but because they bear on whether Biologyx was actually unable to perform under the Agreement and, if so, whether that inability to perform was *caused by* a Force Majeure event.

And, in fact, these communications compel the conclusion that the reimbursement-related issues did not cause Biologyx not to pay the invoices to until, at the earliest, after the invoices on which Celularity now seeks to recover were due. The undisputed evidence establishes that, prior to the occurrence of any event Biologyx asserts constitutes a force majeure event, Biologyx had accumulated an outstanding balance on its account. *See* Celularity SUF ¶ 41. Then, in late November 2021, the first event Biologyx now claims constituted a Force Majeure event occurred: one of the MACs, Noridian, put a hold on processing a category of medications that included Interfyl. *See id.* ¶ 43; April 2022 Emails. By December 3, 2021, Biologyx informed Celularity that Noridian had done so. Celularity SUF ¶ 43. But instead of suspending performance as Biologyx now claims it was forced to do, Biologyx continued to purchase more Interfyl, including the purchases set forth in the four invoices at issue here. *See id.* ¶¶ 46, 49, 52–53. The first such order was released on December 15, 2021, was due in March 2022, and was for $578,200 worth of Interfyl. *See id.* ¶ 46 (citing December 15 Interfyl Invoice). On January 14, 2022, however, Celularity informed Biologyx that it could not release orders to Biologyx unless Biologyx cleared up some of its outstanding balances, and Biologyx responded that it would soon be sending a wire—which it did on January 26, 2022, when it wired Celularity $200,000. *Id.* ¶¶ 47–48, 51. On January 18, 2022, Celularity issued the January 18 Interfyl Invoice, an order of $144,200 worth of Interfyl, with payment due on March 19, 2022. *Id.* ¶ 49. Celularity then issued the January 19 Interfyl Invoice for $130,000 worth of Interfyl, with payment due on March 28, 2022, and the

33

January 28 Interfyl Invoice for $910,000 worth of Interfyl, with payment due on March 29, 2022. *Id.* ¶¶ 52–53.

In the time between Biologyx's placement of these orders—which was after the first Force Majeure event allegedly occurred—and the payments on those orders coming due in March 2022, there is no evidence that Biologyx considered itself unable to pay for the orders due to any Force Majeure event. Instead, Biologyx simply mentioned to Celularity that reimbursement issues were impacting their forecasting and decision of whether to place more orders moving forward. *See, e.g.*, D.E. 96-21 (February 2022 email thread regarding Biologyx's placement of Interfyl orders in February). There is no indication that Biologyx informed Celularity it could not pay the Interfyl Invoices for orders it had already placed. In March 2022, the parties continued to discuss payments for the outstanding invoices (mostly those predating the December and January orders), and on March 21, 2022, Biologyx wired Celularity $400,000. *See* Celularity SUF ¶¶ 56–57. This wire partially covered the outstanding Interfyl Invoices, bringing the $1,762,400 Interfyl balance down to $1,532,050. *See id.* ¶ 59. But while Biologyx again referenced reimbursement-related issues in late March 2022 in its communications with Celularity, it did not inform Celularity that it could no longer pay its Interfyl balance due to those reimbursement-related issues; instead, it continued to promise Celularity that it would pay the entire Interfyl balance. *See* D.Es. 95-30 (March 17, 2022, email from Biologyx to Celularity stating that Saab was "closing [his] business financing the second week of April at which point [Biologyx] intend[ed] to get current"); 95-31 (March 20, 2022, email from Biologyx to Celularity stating it would make a payment while also mentioning reimbursement issues).

Based on the foregoing, the Court concludes that no reasonable trier of fact could find that Biologyx's inability to pay the outstanding Interfyl balance (assuming it was in fact unable to pay

that balance) by the time the relevant invoices came due in late March 2022 was *caused by* the reimbursement issues (assuming those issues constituted a Force Majeure). Biologyx had long been aware of and been in communication with Celularity about the reimbursement issues that had occurred by that time but had consistently told Celularity that it would pay those invoices, and there is no indication that by the time the invoices came due Biologyx could not pay them *because* of the events it now claims constitute Force Majeure events. It was only in the April 2022 Emails that Biologyx suggested that Force Majeure events were causing it to be unable to perform under the Agreement. And, as Celularity points out, it is not even clear that Biologyx took the position on April 19, 2022, that the Suspension Force Majeure Provision specifically suspended its obligation to pay the outstanding Interfyl balance, given that Saab's second email on April 19 clarifies that his reference to the Suspension Force Majeure Provision was "not intended to draw a pause on past product purchases" but rather would "allow[] a pause on the forecast and corresponding purchase commitment." April 2022 Emails. Biologyx has thus failed to meet its burden of production with respect to establishing it could not pay the outstanding Interfyl invoices by the time they came due because of any Force Majeure event. The Court will accordingly strike Biologyx's force majeure affirmative defense and will therefore **GRANT** Celularity's Motion for Partial Summary Judgment as to that affirmative defense and **DENY** Biologyx's Motion for Partial Summary Judgment as to the same.

iii.    Government Action Force Majeure Obligations

Although the Court has stricken Biologyx's force majeure affirmative defense based on the Suspension Force Majeure Provision, because whether Biologyx was permitted to suspend its payment obligations under the Agreement is distinct from whether Celularity complied with its

35

Government Action Force Majeure Obligations,[19] it does not necessarily follow that Celularity's breach of contract claim succeeds. In fact, the Court cannot find as a matter of law that Celularity did not materially breach the Agreement by failing to comply with its Government Action Force Majeure Obligations, and, as such, neither Celularity nor Biologyx prevail on their respective breach of contract claims at this juncture.

As explained *supra* Section III.B.1.b, the Agreement sets forth certain obligations that arise when government action creates a Force Majeure event. *See* Government Action Force Majeure Obligations. These obligations apply to both Celularity and Biologyx and require each party to "commit sufficient resources by which to dispute, contest and reverse such Governmental Authority action that would eliminate the Force Majeure event." *Id.*

Biologyx argues that the Part B reimbursement denials by governmental authorities created a Force Majeure event triggering Celularity's Government Action Force Majeure Obligations and, further, that Celularity did not comply with those obligations. *See* Biologyx MSJ at 13–16. Celularity responds that, even assuming arguendo that the Force Majeure events started in November 2021, it did commit sufficient resources to overturn the relevant government actions. *See* Opp. to Biologyx MSJ 9–21.

Having considered each party's arguments and evidence, the Court finds that genuine issues of material fact preclude granting summary judgment to either party. The parties both provide evidence regarding the efforts Celularity did or did not make to address the government actions causing reimbursement issues from which a trier of fact could either conclude that

---

[19] The two are distinct because a Force Majeure event could occur but not necessarily cause a party to be forced to suspend or delay performance. For instance, as relevant here, a Force Majeure event could trigger the Government Action Force Majeure Obligations without causing performance of the Agreement to be suspended under the Suspension Force Majeure Provision.

Celularity did or not devote sufficient resources to attempt to overturn those government actions. *Compare* Biologyx MSJ at 10–13 (explaining, among other things, that Celularity decided not to submit to the FDA a new pre-RFD for Interfyl to address the reimbursement issues), *with* Opp. to Biologyx MSJ at 11–20 (responding that the new RFD would not have resolved the reimbursement issues and outlining the steps Celularity did take to address those issues). The Court therefore concludes that a genuine issue of material fact exists with respect to the fact-intensive question of whether Celularity complied with its Government Action Force Majeure Obligations. *See Paramount Fin. Commc'ns, Inc. v. Broadridge Inv. Commc'n Sols., Inc.*, No. 15-405, 2019 WL 3022346, at *7 (E.D. Pa. May 23, 2019) (explaining that compliance with similar effort-based contractual provision was a "fact-intensive" question and denying summary judgment as to breach of that provision where the parties told "two very different stories" regarding a party's efforts to perform).

As such, the Court will **DENY** Celularity's Motion for Partial Summary to the extent Celularity argues that it was not in breach of its Government Action Force Majeure Obligations and **DENY** Biologyx's Motion for Partial Summary Judgment to the extent Biologyx argues Celularity breached those same obligations.

iv.    Wrongful termination

The final alleged breach of contract at issue here is Celularity's termination of the Agreement. Biologyx argues that Celularity breached the Agreement when it terminated it on April 23, 2023, instead of complying with its reimbursement-related obligations regarding Interfyl and giving Biologyx the right of first refusal to Biovance 3L to which it was entitled under the Agreement. *See* Biologyx MSJ at 21–22. And, while Biologyx maintains that it has already pled such a wrongful termination breach of contract counterclaim in Count One of the Counterclaim,

37

Biologyx nevertheless also cross-moves to amend its Counterclaim to "remove[] any ambiguity" as to whether it has plead that counterclaim. *Id.* at 31–33; *see also* Cross-Motion to Amend. Celularity opposes that Cross-Motion to Amend and contends that Biologyx never pled wrongful termination either as its own affirmative counterclaim or as a defense to Celularity's breach of contract claim. Opp. to Biologyx MSJ at 26.

The Court agrees with Celularity that Biologyx did not plead a wrongful termination claim in Count One of its Counterclaim. While the Court would have nevertheless permitted Biologyx to amend its Counterclaim to include wrongful termination of the Agreement, the Court will not do so because it finds that such a claim—either as related to Interfyl or Biovance 3L—would not survive Celularity's Motion for Partial Summary Judgment.

*First*, Biologyx's claim that Celularity's termination of the Agreement was wrongful because it had not complied with its reimbursement-related obligations fails given the Court has already found that Celularity had no general obligation to ensure that Interfyl was covered by Part B, *see supra* Section III.B.1.a, and given the Court has decided that Biologyx has not demonstrated that it was entitled to suspend payment of the relevant Interfyl invoices under the Suspension Force Majeure Provision, *see supra* Section III.B.2.a.ii. And if Biologyx was not entitled to suspend payment of those invoices, then—unless Celularity did not abide by the terms of the Termination Provision—Celularity could terminate the Agreement for non-payment.[20] But Biologyx has not argued that the termination did not comply with the terms of the Termination Provision. Accordingly, Biologyx has not brought forth a viable wrongful termination claim with respect to Celularity's reimbursement-related obligations.

---

[20] For the avoidance of doubt, whether Celularity had the right to terminate the Agreement does not definitively determine whether Celularity itself otherwise breached the Agreement and/or whether Celularity may recover for Biologyx's breach.

And, *second*, because Biologyx has not sufficiently demonstrated that Celularity wrongfully terminated the Agreement based on Biologyx's non-payment of the Interfyl invoices, its Biovance 3L-related wrongful termination also fails. Biologyx contends that Celularity terminated the Agreement to prevent Biologyx from exercising its right of first offer to Biovance 3L—which was introduced several months after the Agreement was terminated—under § 12.2 of the Agreement.[21] *See* Biologyx MSJ at 22. But Celularity could not have violated the right of first offer under the Agreement for a medication introduced several months after the Agreement was rightfully terminated by Celularity. With the Agreement already terminated, Celularity was no longer required to give Biologyx right of first offer. At least with respect to Biologyx's wrongful termination breach of contract claim, whether Celularity had other motives to terminate the agreement (including preventing Biologyx from exercising its right of first offer as to Biovance 3L) is irrelevant to whether such a claim succeeds given Biologyx has not demonstrated that the Celularity was not entitled to terminate the Agreement in the first place. Biologyx's wrongful termination claim regarding the right of first offer for Biovance 3L therefore fails.

Because neither of Biologyx's wrongful termination breach of contract counterclaims would survive Celularity's Motion for Partial Sumamry Judgment, the Court will therefore **DENY** Biologyx's Cross-Motion to Amend its Counterclaim to add those counterclaims as **MOOT**, **GRANT** Celularity's Motion for Partial Summary Judgment to the extent Biologyx sought to bring any wrongful termination breach of contract counterclaims, and **DENY** Biologyx's Motion for Partial Summary Judgment to the same extent.

---

[21] § 12.2 of the Agreement provides, in relevant part: "As of the Effective Date, Celularity grants to [Biologyx] a right of first offer . . . with respect to the Commercialization of any Competing Product and any other biologic product developed or acquired by Celularity that has application in the Field in the Territory . . . ."

        b.      <u>Quasi-contractual claims related to Interfyl (Counts III, IV, and V of the Complaint and Counts Six and Seven of the Counterclaim)</u>

Having defined the contours of the parties' obligations under the Agreement and permitted Biologyx's breach of contract claim in Count One of the Counterclaim as to Celularity's potential breach of its Government Action Force Majeure Obligations and Celularity's breach of contract claim in Count I of the Complaint as to non-payment of the Interfyl invoices to move forward, the Court now turns to the parties' quasi-contractual claims related to Interfyl.

Celularity brings quasi-contractual claims for unjust enrichment (Count III of the Complaint), quantum meruit (Count IV of the Complaint), and promissory estoppel (Count V of the Complaint).  Compl. ¶¶ 48–63.  Biologyx, for its part, brings quasi-contractual counterclaims for unjust enrichment (Count Six of the Counterclaim) and quantum meruit (Count Seven of the Counterclaim).  Counterclaim ¶¶ 167–78.  Each party moves for summary judgment on its opponent's quasi-contractual claims[22] but does not so move on its own affirmative claims.  As it did at the motion to dismiss stage, the Court applies New Jersey law to these claims, *see* Opinion on Motion to Dismiss at 7, as do both Biologyx and Celularity in their respective Motions, Celularity MSJ at 26–29; Biologyx MSJ at 17–20.

---

[22] Biologyx argues that Celularity's Motion for Partial Summary Judgment on Biologyx's quasi-contractual counterclaims should be denied because Celularity's Notice of Motion failed to indicate that it was moving for summary judgment on those counterclaims.  *See* Opp. to Celularity MSJ at 24 n.7.  The Court, however, agrees with Celularity that Celularity clearly moved for summary judgment on those counterclaims in its brief and that Biologyx had clear notice that Celularity was doing so.  *See* Celularity MSJ at 26–29; *see also* Opp. to Celularity MSJ at 24–26 (substantively responding to Celularity's arguments regarding Biologyx's quasi-contractual claims).  And Celularity points to no authority denying summary judgment on a claim on the basis that a party's notice of motion did not reference that claim but the brief did.  *See* Opp. to Celularity's MSJ at 24 n.7 (discussing only cases where a non-*pro se* party did not clearly indicate to a party proceeding *pro se* that the non-*pro se* party was moving for summary judgment in a hybrid motion to dismiss/motion for summary judgment).  The Court will therefore decline to deny Celularity's Motion for Partial Summary Judgment on Biologyx's quasi-contractual counterclaims on this procedural ground.

The Court addresses Celularity's quasi-contractual claims related to Interfyl first and disposes of those claims quickly because Celularity does not oppose Biologyx's Motion for Partial Summary Judgment as to Celularity's quasi-contractual claims related to Interfyl. *See* Opp. to Biologyx MSJ at 22. The Court will therefore **GRANT** Biologyx's Motion for Summary Judgment as to Counts III, IV, and V of the Complaint to the extent they are brought in connection with Interfyl purchases.

While Biologyx does not similarly abandon its unjust enrichment and quantum meruit counterclaims, those counterclaims should nevertheless also be dismissed because "an express contract exists concerning . . . [a] subject matter" "identical" to the claimed "[q]uasi-contractual obligation[]." *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226–27 (3d Cir. 1983) (applying New Jersey law to unjust enrichment claim); *New York-Connecticut Dev. Corp. v. Blinds-To-Go (U.S.) Inc.*, 159 A.3d 892, 901 (N.J. App. Div. 2017) ("It has long been recognized . . . 'that the existence of an express contract excludes the awarding of relief regarding the same subject matter based on quantum meruit.'" (quoting *Kas Oriental Rugs v. Ellman*, 926 A.2d 387 (N.J. App. Div. 2007)). Here, Biologyx's unjust enrichment and quantum meruit counterclaims concern actions that are governed by the Agreement and that are co-extensive with Biologyx's breach of contract counterclaim. Biologyx brings these quasi-contractual counterclaims for Celularity's provision of Interfyl that was supposedly nonsaleable because it could not be reimbursed through Part B due to Celularity's failure to ensure it was reimbursable. *See* Counterclaim ¶¶ 167–78. But Celularity's obligations regarding Interfyl remaining reimbursed through Part B are explicitly set forth in an express contract—the Agreement—and the Court has extensively discussed these obligations in relation to the parties' breach of contract claims. *See supra* Section III.B.2.a. In fact, as Celularity points out, Biologyx's quantum meruit

41

counterclaim repeatedly references the Agreement and anchors the counterclaim in Celularity's failure to provide Biologyx with "Interfyl product that confirmed to the terms of the Agreement." Counterclaim ¶ 177; *see* Celularity MSJ at 27–28.  The Court will thus **GRANT** Celularity's Motion for Partial Summary Judgment as to Biologyx's unjust enrichment counterclaim (Count Six of the Counterclaim) and quantum meruit counterclaim (Count Seven of the Counterclaim).

c.      <u>Biologyx's breach of warranty counterclaims related to Interfyl (Counts Two, Three, and Four of the Counterclaim)</u>

Next up are Biologyx's breach of warranty counterclaims.  Biologyx brings counterclaims for breach of an express warranty, the implied warranty of merchantability, and the implied warranty of fitness for a particular purpose, Counterclaim ¶¶ 123–60, and moves for summary judgment as to each of those counterclaims, Biologyx MSJ at 23–28.  Celularity opposes and itself moves for summary judgment as to those counterclaims.  Celularity MSJ at 10–26.

Consistent with its interpretation of the Agreement discussed *supra* Section III.B.1, the Court will **GRANT** Celularity's Motion for Partial Summary Judgment as to Biologyx's breach of warranty counterclaims (Counts Two, Three, and Four of the Counterclaim) and **DENY** Biologyx's Motion for Partial Summary Judgment as to those same counterclaims.[23]

i.      Breach of express warranty (Count Two of the Counterclaims)

Biologyx asserts that Celularity expressly warranted in the Agreement that Interfyl would be reimbursed through Part B.  *See* Biologyx MSJ at 24–25.  Specifically, Biologyx points to § 10.1(b), which provides that each party "represents and warrants to the other Party" that "[a]ll

---

[23] Biologyx oscillates between applying New Jersey and Delaware law in analyzing these counterclaims, *see, e.g.*, Opp. to Celularity's MSJ at 20–23; Biologyx's MSJ at 26–27, whereas Celularity primarily applies Delaware law, *see, e.g.*, Celularity's MSJ at 17–21.  Because Biologyx, as explained below, bases its warranty counterclaims on an interpretation of the Agreement the Court has already rejected, the Court need not conduct a choice of analysis.

necessary consents, approvals and authorizations of all regulatory and governmental authorities required to be obtained by such Part in connection with the execution and delivery of this Agreement and the performance of its obligations hereunder have been obtained," and § 11.1(b) and (c), which require Celularity to "obtain and maintain applicable certifications, permits, and all other required state and local regulatory approvals." *See* Biologyx MSJ at 25.

But, for the reasons explained *supra* Section III.B.1.a, the Agreement did not obligate Celularity to obtain or maintain any regulatory approvals related to the reimbursement of Interfyl and/or otherwise ensure that Interfyl was reimbursed by Part B. Biologyx has accordingly failed to identify an express warranty in the Agreement that Celularity has breached. The Court will therefore **GRANT** Celularity's Motion for Partial Summary Judgment as to Biologyx's breach of express warranty counterclaim (Count Two of the Counterclaim) and **DENY** Biologyx's Motion for Partial Summary Judgment as to the same counterclaim.

> ii.     Breach of the implied warranties of merchantability and fitness for a particular purpose (Counts Three and Four of the Counterclaim)

Biologyx also brings counterclaims for breach of the implied warranties of merchantability and fitness for a particular purpose. Counterclaim ¶¶ 134–60. Biologyx contends that the Interfyl it was sold was not fit for sale because both the ordinary use of Interfyl and Biologyx's particular purpose for purchasing Interfyl required Interfyl to be reimbursable through Part B. Biologyx MSJ at 26–28. But these definitions of Interfyl's ordinary use and Biologyx's particular purpose for purchasing Interfyl rely on interpretations of the Agreement the Court has already repeatedly rejected. *See supra* Sections III.B.1.a, 2.a.i, 2.c.i. The Court therefore need look no further to **GRANT** Celularity's Motion for Partial Summary Judgment as to Biologyx's breach of the implied warranties of merchantability and fitness for a particular purpose counterclaims (Counts

43

Three and Four of the Counterclaim) and **DENY** Biologyx's Motion for Partial Summary Judgment as to the same counterclaims.

> d.   Biologyx's breach of the implied covenant of good faith and fair dealing counterclaims related to Interfyl and Biovance 3L (Count Five of the Counterclaim)

The Court now turns to Biologyx's counterclaims for breach of the implied covenant of good faith and fair dealing related to Interfyl and Biovance 3L. *See* Counterclaim ¶¶ 161–66. Biologyx maintains that Celularity did not act in good faith when it failed to take steps to reverse the reimbursement-related Force Majeure event for Interfyl and then terminated the Agreement so as not to be required to provide Biologyx with the right of first offer for Biovance 3L. *See* Biologyx MSJ at 28–30. Only Biologyx moves for summary judgment on these counterclaims, but Celularity opposes that motion. *See id.*; Opp. to Biologyx MSJ at 32–34.

The Court analyzes these counterclaims under Delaware law, as it did with Celularity's good faith and fair dealing claim in the Opinion on Motion to Dismiss. *See* Opinion on Motion to Dismiss at 7 ("Given that '[t]he covenant of good faith and fair dealing arises under contract,' and Plaintiff's breach of contract claim is governed by Delaware law, it follows that Plaintiff's implied covenant of good faith and fair dealing claim must also be analyzed under Delaware law in accordance with the Agreement's choice of law provision." (quoting *Hatteras Press, Inc. v. Avanti Comput. Sys. Ltd.*, No. 16-5420, 2017 WL 2838349, at \*4 (D.N.J. June 30, 2017)).

Applying Delaware law to Biologyx's counterclaims regarding Biovance 3L and Interfyl, the Court finds that they both fail as a matter of law. The Delaware Supreme Court has explained that the implied covenant of good faith and fair dealing "cannot be invoked when the contract addresses the conduct at issue," especially where such a claim is based on "conduct authorized by the terms of the agreement." *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021). Here, the Court has already held that Celularity was entitled to terminate the Agreement prior to

introducing Biovance 3L to market. *See supra* Section III.B.2.a.iv. Accordingly, Celularity could not have breached the implied covenant of good faith and fair dealing in doing so. *See Glaxo Grp.*, 248 A.3d at 920–21 (reversing trial court's denial of motion for judgment as a matter of law on implied covenant of good faith and fair dealing claim where it had been "used to imply terms that modif[ied] or negat[ed] a[] . . . contractual right authorized by an agreement"). And, as for the Interfyl-related counterclaim, Biologyx's good faith and fair dealing argument—that Celularity did not comply with its obligations to cure the reimbursement-related Force Majeure event(s) under the Government Action Force Majeure Provision, *see* Biologyx MSJ at 30—is nearly identical to its breach of contract argument regarding the same conduct. That's because the language of the Agreement—the Government Action Force Majeure Provision—"expressly covers [this] particular issue" and therefore "the implied covenant [does] not apply." *Calumet Cap. Partners LLC v. Victory Park Cap. Advisors, LLC*, No. 2025-36, 2026 WL 374887, at *23 (Del. Ch. Jan. 29, 2026).

The Court will thus **DENY** Biologyx's Motion for Partial Summary Judgment as to its breach of the covenant of good faith and fair dealing counterclaims in Count V of the Counterclaim and **DISMISS** those counterclaims.

          e.      <u>Biologyx's fraud counterclaim related to Interfyl (Count Eight of the Counterclaim)</u>

Biologyx's final counterclaim related to purchases of Interfyl is its fraud counterclaim in Count Eight of the Counterclaim. *See* Counterclaim ¶¶ 179–83. As relevant to Interfyl purchases, Biologyx brings this counterclaim for Celularity's fraudulent misrepresentations: (1) regarding "the sizes of Interfyl that would be reimbursed under Medicare Part B," (2) "that [Celularity] intended to fulfil[l] their obligations that Interfyl had all of the Regulatory and Governmental approvals," (3) "that the Interfyl product delivered to [Biologyx] would all have at least twenty-

four (24) month shelf life," and (4) "that [Celularity] would dispute, contest, and reverse the Force Majeure Event." *Id.* ¶ 180.

Celularity moves for summary judgment on this counterclaim, *see* Celularity MSJ at 29–33, which Biologyx opposes but does not affirmatively move for itself, *see* Opp. to Celularity MSJ at 26–28. In its Opposition to Celularity's Motion for Partial Summary Judgment, Biologyx does not, however, address the allegedly fraudulent misrepresentations regarding the sizes and shelf life of Interfyl it had identified in the Counterclaim. *See* Opp. to Celularity MSJ at 26–28; Counterclaim ¶ 180. The Court will therefore **GRANT** Celularity's Motion for Partial Summary Judgment as to Count Eight of the Counterclaim to the extent it brings fraud counterclaims based on representations regarding the sizes and shelf life of Interfyl. *See Player v. Motiva Enters., LLC*, 240 F. App'x 513, 522 n.4 (3d Cir. 2007) (holding that the district court had properly granted defendant's motion for summary judgment on a claim where plaintiffs had failed to contest it in response to defendant's motion for summary judgment).

Moreover, although Biologyx did respond to Celularity's arguments regarding the other two allegedly fraudulent representations Celularity made regarding Interfyl purchases—"that [Celularity] intended to fulfil[l] their obligations that Interfyl had all of the Regulatory and Governmental approvals" and "that [Celularity] would dispute, contest, and reverse the Force Majeure Event," Counterclaim ¶ 180, the Court nevertheless finds that a fraud counterclaim based on these representations is barred by the economic loss doctrine.[24]

As the Court previously explained in its Opinion on Motion to Dismiss:

"The economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract." *Rainforest Distrib. Corp. v. Vybes L.A. LLC*, No. 20-634, 2021 WL 3879099, at *9 (D.N.J. Aug. 31,

---

[24] The Court applies New Jersey law to this counterclaim, as it did with Celularity's fraud claim at the motion to dismiss stage. *See* Opinion on Motion to Dismiss at 7.

2021) (quoting *Chen v. HD Dimension, Corp.*, No. 10-863, 2010 WL 4721514, at *8 (D.N.J. Nov. 15, 2010)); *see also Atlas Acquisitions, LLC v. Porania, LLC*, No. 18-17524, 2019 WL 6130774, at *3 (D.N.J. Nov. 19, 2019) ("Under New Jersey law, a plaintiff typically may not recover in tort for damages caused by a breach of contract . . . ."). It follows, "a tort claim can [only] be asserted alongside a breach of contract claim . . . if the tortious conduct is extrinsic to the contract between the parties." *Chen*, 2010 WL 4721514, at *8 (D.N.J. Nov. 15, 2010) (citing *Capitalplus Equity, LLC v. Prismatic Dev. Corp.*, No. 07-321, 2008 WL 2783339, at *6 (D.N.J. July 16, 2008)).

Opinion on Motion to Dismiss at 15 (citation modified).

Here, Biologyx's fraud counterclaim related to Interfyl purchases is not extrinsic to the contract but, rather, is based on "fraudulent performance of the [Agremeent] itself." *Unifoil Corp. v. Cheque Printers & Encoders Ltd.*, 622 F. Supp. 268, 271 (D.N.J. 1985) (quoting *Foodtown v. Sigma Marketing Systems, Inc.*, 518 F. Supp. 485, 490 (D.N.J. 1980)). The Court has extensively and exhaustively addressed the parties' arguments regarding Celularity's reimbursement-related obligations (including those related to the various force majeure provisions) under the Agreement and it is clear that Biologyx's fraud allegations cannot be separated from Celularity's obligations under the Agreement. And "[t]he manner in which [Celularity] breached the contract, be it fraudulently or otherwise, is an issue to be resolved within the contours of contract principles." *Chen*, 2010 WL 4721514, at *9. The Court will accordingly **GRANT** Celularity's Motion for Partial Summary Judgment as to Biologyx's fraud counterclaim in Count Eight of the Counterclaim to the extent it is brought for Biologyx's purchases of Interfyl based on the representations "that [Celularity] intended to fulfil[l] [its] obligations that Interfyl had all of the Regulatory and Governmental approvals" and "that [Celularity] would dispute, contest, and reverse the Force Majeure Event," Counterclaim ¶ 180.[25]

---

[25] For the avoidance of doubt, the Court has therefore granted Celularity's Motion for Partial Summary Judgment as to Biologyx's fraud counterclaim brought in connection with any Interfyl purchases.

C.    **Claims Related to Biovance**

The parties also bring (more poorly defined) claims related to Biovance, another of Celularity's products.    Celularity brings breach of contract, account stated, and quasi-contractual claims for Biologyx's non-payment of an invoice for $883,000 worth of Biovance.  *See* Compl. ¶¶ 39–43, 48–63, 69–74; Opp to Biologyx MSJ at 21–23.   Biologyx, in turn, brings a fraud counterclaim related to its Biovance purchase.  *See* Counterclaim ¶¶ 111–17, 179–83.

Celularity moves for summary judgment on its breach of contract and account stated claims related to Biovance in Counts I and VII of the Complaint, as well as on Biologyx's fraud counterclaim related to Biovance in Count Eight of the Counterclaim.  *See* Celularity MSJ at 6–8, 29–30.  Biologyx, for its part, moves for summary judgment on Celularity's breach of contract, account stated, and quasi-contractual claims related to Biovance, but does not affirmatively move on its own fraud counterclaim.  *See* Biologyx MSJ at 6–20.

In analyzing these Biovance-related claims, the Court must determine whether the Biovance purchase at issue here was made as part of the Agreement because that determination bears heavily on the success of those claims.  The parties advocate for different resolutions of this question—with Celularity arguing that the purchase was made outside the Agreement, Celularity Reply at 3, and Biologyx contending that Celularity "integrated Biovance into the . . . Agreement through its writings, actions, and behaviors," Opp. to Celularity MSJ at 5.  As explained below, the Court concludes that Biologyx has not established that the Biovance purchase was made as part of the Agreement and/or "integrated" into the Agreement.

But, even after having reached this conclusion regarding Biovance's relationship to the Agreement, the Court nevertheless finds that Celularity's breach of contract claim related to Biovance (as presented in the Complaint) fails and will therefore **GRANT** Biologyx's Motion for Partial Summary Judgment as to this claim and **DENY** Celularity's Motion for Partial Summary

Judgment as to the same. The Court will, however, **DENY** both Biologyx's and Celularity's Motions for Partial Summary Judgment as to Celularity's account stated claim related to Biovance. The Court will further **DENY** Biologyx's Motion for Partial Summary Judgment as to Celularity's quasi-contractual claims related to Biovance. And, finally, the Court will **GRANT** Celularity's Motion for Partial Summary Judgment as to Biologyx's fraud claim related to Biovance.

### 1. Relationship between the Agreement and the Biovance purchase

As previewed above, the parties disagree over whether the Biovance purchase has somehow been "integrated" into the Agreement. The Court finds that it has not.

Biologyx maintains that its purchase of Biovance worth $883,000 was integrated into the Agreement by Celularity's inclusion of the invoice for that purchase in its (1) notice of material breach of the Agreement for non-payment of invoices, (2) notice of termination of the Agreement for material breach thereof, and (3) Complaint (as supporting a claim for breach of the Agreement). *See id.* at 10–14. Biologyx further points to a purported oral agreement between Celularity and Biologyx executives that the purchase of Biovance would offset Biologyx's minimum purchase commitment for Interfyl under the Agreement once Celularity cured the Force Majeure event as supporting this integration. *See id.* at 11–12.

Celularity disputes that such an oral agreement was made and further disputes that—even if it was made—such an oral agreement or any of the other actions Biologyx claims incorporated Biovance into the Agreement could actually incorporate Biovance into the Agreement. *See* Celularity Reply at 3–4. In support of its position, Celularity points to the relevant amendment provisions in the Agreement, which require mutual written agreement to amend the Agreement. *See id.* (citing Agreement §§ 1.34, 12.11).

Based on these provisions—and Delaware law regarding contract modification, the Court agrees with Celularity that Biologyx has not sufficiently demonstrated that the Biovance purchase

was integrated into the Agreement.  While Biologyx labels what it claims occurred with respect to the Biovance and the Agreement as an "integrat[ion]" or "incorporat[ion]," *see* Opp. to Celularity MSJ at 11–13, it is best described as a potential *modification* of the Agreement.  And, as noted above, the Agreement requires "mutual written agreement of the Parties" to amend the exhibit identifying the products subject to the Agreement, Agreement § 1.34, and, more generally, provides that the Agreement "may be amended only by a writing signed and delivered by the Parties' authorized representatives," *id.* § 12.11.  Biologyx does not dispute that Biovance is not a product listed in the Agreement as subject to the Agreement.  *See* Opp. to Celularity MSJ at 10.  Accordingly, per the terms of the Agreement itself, the Agreement could not be modified to include Biovance unless there was a "mutual written agreement of the Parties."  Agreement § 1.34.

The Court's inquiry does not end there, however.  Under certain circumstances, "contract provisions deeming oral [or unilateral] modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision."  *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1229 (Del. Ch. 2000) (citing *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972)).  But Biologyx has not established that the Agreement's requirement that a change in the products covered by the Agreement be made by mutual written agreement was waived orally or by a course of conduct.  The party asserting an oral or course of conduct waiver must "prove the intended change with 'specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document.'"  *Id.* at 1230 (quoting *Reeder v. Sanford Sch., Inc.*, 397 A.2d 139, 141 (Del. 1979)).  Biologyx has not done so.  Instead, it relies on a declaration from its CEO vaguely referencing conversations with a Celularity executive in which that executive purportedly represented that Celularity would apply the Biovance purchase against Biologyx's minimum purchase commitment

50

for Interfyl once Celularity cured the Force Majeure event, *see* Opp. to Celularity MSJ at 11–12 (citing Saab Declaration ¶¶ 45–46), and Celularity's inclusion of the invoice in a list of invoices Biologyx had not paid in its Notice of Breach.  But neither the declaration nor any of Celularity's actions with respect to the breach of the Agreement specify critical details including when the conversations between Celularity and Biologyx took place, how exactly the Biovance purchase would change the Interfyl purchase commitment under the Agreement, what the parties' obligations would be regarding this Biovance purchase or any future purchases thereof, and/or whether all of the Agreement's provisions would apply to Biovance.  *See generally* Saab Declaration.  The Court therefore declines Biologyx's invitation to find that the Agreement was modified orally or by a course of conduct.  *See Rsrvs. Dev. LLC v. Severn Sav. Bank, FSB*, No. 2502, 2007 WL 4054231, at \*10 (Del. Ch. Nov. 9, 2007) (finding no modification because "the evidence fail[ed] to indicate directly and specifically the intended terms of the purported oral modification" and was thus "not sufficiently specific and direct to rule out doubt regarding the parties' intentions"), *aff'd*, 961 A.2d 521 (Del. 2008).  With no evidence of modification of the Agreement, the Court thus finds that the Biovance purchases were made outside of the Agreement.

2.      *Analysis of the parties' Biovance-related claims*

The Court now analyzes the parties' Biovance-related claims in light of its findings regarding the Biovance purchase's relationship with the Agreement.

a.      Celularity's breach of contract claim related to Biovance (Count I of the Complaint)

Although the Court has sided with Celularity with respect to the interplay between Biovance and the Agreement, Celularity's breach of contract claim related to Biovance does not survive summary judgment.  That's because Celularity has only brought its breach of contract claim in Count I of the Complaint for a breach of the *Agreement*.  *See* Compl. ¶¶ 39–43 (bringing

the claim for "a clear breach of the terms of the Agreement" and referencing only the Agreement throughout).  Celularity now attempts to circumvent its own pleading choices by arguing that the Biovance purchase was made in a separate agreement.  *See* Celularity MSJ at 7.  But that was not what it pled.  Nor is it something it sought to raise in a motion to amend its Complaint.  *See generally* Dkt.  It is well established that a plaintiff may not amend its complaint "via briefs on a motion for summary judgment."  *Interlink Grp. Corp. USA v. Am. Trade & Fin. Corp.*, No. 12-6179, 2014 WL 3578748, at *10 (D.N.J. July 18, 2014); *see also, e.g.*, *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).  The Court will not countenance Celularity's efforts to circumvent the pleading process by attempting to amend its Complaint via its briefs.  Accordingly, the Court will **GRANT** Biologyx's Motion for Partial Summary Judgment to the extent Celularity sought to bring a breach of contract claim related to Biovance in Count I of the Complaint and will **DENY** Celularity's Motion for Partial Summary Judgment to the same extent.[26]

> b.    <u>Celularity's account stated claim (Count VII of the Complaint)</u>

Next up is Celularity's account stated claim regarding the unpaid Biovance invoice.  *See* Compl. ¶¶ 69–74.

The Court first notes that it will apply New Jersey law to this claim, as both parties do and as the Court did at the motion to dismiss stage.  *See* Opinion on Motion to Dismiss at 7.    To

---

[26] It is unclear to what extent Biologyx's breach of contract counterclaim in Count One of the Counterclaim incorporates Biovance.  For the avoidance of doubt, however, given that the Court has found that Biovance is not part of the Agreement, the Court will **GRANT** Celularity's Motion for Partial Summary Judgment to the extent Biologyx has brought such a counterclaim and **DENY** Biologyx's Motion for Partial Summary Judgment to the same extent.

prevail on an account stated claim under New Jersey law, a plaintiff must establish "(1) 'the existence of a debt from a transaction or series of transactions memorialized in such a statement'; (2) 'mutual agreement between the debtor and creditor as to the correctness of its amount'; and (3) 'a promise by the debtor to pay that sum.'" *Samra Plastic & Reconstructive Surgery v. UnitedHealthcare Ins. Co.*, No. 25-6001, 2026 WL 266754, at *7 (D.N.J. Feb. 2, 2026) (quoting *Accounteks.Net, Inc. v. CKR Law, LLP*, No. A-1067-20, 2023 WL 3331802, at *8 (N.J. App. Div. May 9, 2023)). "A debtor's assent to the amount may either be express or implied by a failure to object within a reasonable time, and [its] promise to pay may likewise be either express or implied." *Id.* (quoting *Accounteks.Net*, 2023 WL 3331802, at *8).

Celularity asserts that it reached an agreement with Biologyx as to the amount due for Biovance and Biologyx promised to pay that amount, but Biologyx has not followed through on that promise. *See* Celularity MSJ at 8–9. Biologyx responds that any promise to pay that Biovance invoice was subject to conditions, including Biologyx obtaining financing and Celularity taking specific actions with respect to the Interfyl issues. *See* Opp. to Celularity MSJ at 14. While the Court held *supra* Section III.C.1 that Biologyx had not met its burden to show that the Agreement was modified to incorporate the relevant Biovance invoice, it is *Celularity* that carries the burden of proof of establishing each of the elements of an account stated claim. As such, the Court's conclusion in that context is not dispositive here. And, bearing in mind the burden of proof and the current posture, the Court finds that, while there is more than sufficient evidence for the claim to survive Biologyx's Motion for Partial Summary Judgment, there is a genuine dispute as to the material fact of whether Biologyx promised to pay the $833,000 invoice precluding summary judgment for Celularity on this claim. Celularity, for instance, offers evidence including the invoice at issue showing the amount of $833,000 and an email from Saab acknowledging the

53

amount of the unpaid balance and other language from which a reasonable jury could infer Biologyx promised to pay that amount. *See* Biovance Invoice; April 2022 Emails. Although Biologyx's evidence that it did not promise to pay that amount is weaker, the careful language used in Saab's email is sufficient for a reasonable jury to find that the Biovance invoice "would" be paid only under certain circumstances. *See* April 2022 Emails ("[T]he balance for that product would be paid."); *see also* D.E. 96-7 ("Saab Dep.") at 236:21–237:18 (explaining that, in his view, payment for Biovance was conditional).

Based on this genuine dispute of material fact, the Court will **DENY** both Biologyx's and Celularity's Motions for Partial Summary Judgment as to Celularity's account stated claim related to Biovance.[27]

### c. Celularity's quasi-contractual claims related to Biovance (Counts III, IV, and V of the Complaint)

The Court now turns to Celularity's quasi-contractual claims related to Biovance, which Celularity brings for unjust enrichment in Count III, quantum meruit in Count IV, and promissory estoppel in Count V. Compl. ¶¶ 48–63. Only Biologyx moves for summary judgment as to these quasi-contractual claims. Biologyx MSJ at 17–20; *see* Celularity MSJ at 6–9 (only affirmatively moving for summary judgment on its breach of contract and account stated claims).

Biologyx, however, bases its entire argument with respect to these quasi-contractual claims on the conduct at issue being "governed by a contract [(the Agreement)], which precludes reliance

___

[27] Celularity has also brought its account stated claim in Count VII of the Complaint with respect to Interfyl, though neither party discusses it in depth. Because—unlike the Biovance-related account stated claim—this account stated claim is "inseparable from" Celularity's breach of contract claim regarding Interfyl, and the Court has permitted the relevant portions of Celularity's breach of contract claim to move forward, the Court will also **DENY** Celularity's Motion for Partial Summary Judgment as to Count VII to the extent it relates to the Interfyl invoices. *See Manley Toys, Ltd. v. Toys R Us, Inc.*, No. 12-3072, 2013 WL 244737, at *5 (D.N.J. Jan. 22, 2013) (declining to dismiss account stated counts where they were "inseparable from [the plaintiff's] breach of contract claim").

on a [quasi-contractual] theory." Biologyx MSJ at 17 (addressing unjust enrichment); *see also id.* at 18–20 (making the same argument for Celularity's quantum meruit and promissory estoppel claims). The problem is that the Court has already rejected Biologyx's argument that the Biovance purchase was governed by the Agreement. *See supra* Section III.C.1. Biologyx, therefore, cannot prevail on that basis. As such, the Court will **DENY** Biologyx's Motion for Partial Summary Judgment as to Celularity's quasi-contractual claims in Counts III, IV, and V of the Complaint to the extent they relate to Biovance.[28]

d.    <u>Biologyx's fraud counterclaim related to Biovance (Count Eight of the Counterclaim)</u>

Last up is Biologyx's fraud counterclaim related to Biovance, which it brings in Count Eight of the Counterclaim. *See* Counterclaim ¶¶ 179–83. Biologyx alleges that, in order to induce Biologyx to purchase Biovance, Celularity fraudulently represented (1) "that [Celularity] intended to fulfil[l] their obligations that Interfyl had all of the Regulatory and Governmental approvals," (2) "that [Celularity] would dispute, contest, and reverse the Force Majeure Event," and (3) "that their Biovance product would have longevity in the marketplace despite knowing that they intended to produce and distribute into the market a superior second generation product." *Id.* ¶ 180.

The Court, however, concludes that—under Biologyx's own theory of the case—the economic loss doctrine bars Biologyx from bringing a fraud counterclaim related to Biovance based on these alleged misrepresentations. As further explained *supra* Section III.B.2.e, New Jersey law "prohibit[s] fraud claims when the 'fraud contemplated by the plaintiff . . . does not seem to be extraneous to the contract, but rather on fraudulent performance of the contract itself.'"

---

[28] But because Celularity has not itself moved for summary judgment on these claims, the Court will not enter judgment in its favor.

*Unifoil*, 622 F. Supp. at 271 (quoting *Foodtown*, 518 F. Supp. at 490). Here, the first two alleged misrepresentations—those regarding Celularity's fulfillment of its reimbursement-related obligations in the Agreement—are directly related to the performance of the Agreement. Moreover, although Biologyx essentially argues that that these misrepresentations induced it to modify the Agreement to include a purchase of Biovance, Biologyx attempts to avoid the implications of that argument with respect to its fraud counterclaim after being confronted with the economic loss doctrine. *See* Opp. to Celularity MSJ at 26–27 (arguing that the "misrepresentations of Biovance to induce [Biologyx] to purchase w[ere] outside of the . . . Agreement at the time"). But simply stating that an action was outside of the Agreement while simultaneously describing an oral agreement to change Biologyx's obligations under the Agreement (offsetting its minimum purchase commitment of Interfyl under the Agreement) does not make it so. The Court will not permit Biologyx to have it both ways or escape the ramifications of its own theory of the case. Accordingly, based solely on Biologyx's own interpretation of the Biovance purchase,[29] the Court rejects Biologyx's argument that these alleged misrepresentations were extraneous to the Agreement. And the Court will further **GRANT** Celularity's Motion for Partial Summary Judgment as to this Biovance-related counterclaim because the Court has rejected the only basis on which Biologyx opposes that motion.

### D.    Damages Arguments

Along with moving for summary judgment as to liability on several of its own claims and Biologyx's counterclaims, Celularity moves for summary judgment as to certain of Biologyx's damages claims. *See* Celularity MSJ at 33–38. Specifically, Celularity seeks to bar Biologyx from

---

[29] It matters not that the Court found that the Agreement was not in fact modified to include Biovance. *See supra* Section III.C.1. The Court dismisses the claim based on Biologyx's failure to coherently oppose Celularity's Motion for Partial Summary Judgment on this issue.

recovering: (1) punitive damages, *id.* at 36–38, (2) attorneys' fees, *id.* at 38, and (3) consequential damages, which it defines as including lost profit damages for Interfyl and Biovance 3L, *see* Opp. to Biologyx MSJ at 34–37.   Biologyx opposes.  *See* Opp. to Celularity MSJ at 29–31.

As detailed below, the Court will **GRANT** Celularity's Motion for Partial Summary Judgment as to Biologyx's entitlement to punitive damages, attorneys' fees, lost profits related to the termination of the Agreement (including for Biovance 3L), and non-lost profits consequential damages.  The Court will, however, **DENY** Celularity's Motion for Partial Summary Judgment as to Biologyx's entitlement to lost profits damages for Interfyl.

### 1.    *Punitive damages*

In its Motion for Partial Summary Judgment, Celularity argues that Biologyx may not recover any punitive damages because it has not adduced sufficient evidence to establish that Celularity's conduct was "particularly reprehensible, reckless, or motivated by malice or fraud." Celularity MSJ at 36–38 (citing *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 529 (Del. 1987)).   In response, Biologyx rests nearly its entire argument as to why punitive damages are appropriate on its fraud claim related to Biovance.  *See* Opp. to Celularity MSJ at 31–32.  But because the Court has dismissed that claim, *see supra* Section III.C.2.d, Biologyx cannot be entitled to punitive damages on that basis.  After excising Biologyx's reliance on fraud from its punitive damages argument, all that Biologyx is left with is a throwaway reference to "Celularity refus[ing] to accept the return of the inventory that is the basis of the Complaint."  *See* Opp. to Celularity MSJ at 32. That alone is simply insufficient to permit a reasonable inference that Celularity's conduct was "sufficiently outrageous to warrant the imposition of punitive damages." *Jardel*, 523 A.2d at 527. The Court will therefore **GRANT** Celularity's Motion for Partial Summary Judgment as to Biologyx's entitlement to punitive damages.

### 2. *Attorneys' fees*

The Court now turns to Celularity's Motion for Partial Summary Judgment as to Biologyx's request for attorneys' fees. *See* Celularity MSJ at 38. Celularity moves for summary judgment on this request because Biologyx has not established a basis to depart from "the general rule . . . that each party shall bear the cost of [its] own attorneys' fees and costs"—a rule the Court had cited in dismissing Celularity's own request for attorneys' fees at the motion to dismiss stage. *See id.* (quoting Opinion on Motion to Dismiss at 19). Biologyx provides no response to this argument. *See* Opp. to Celularity MSJ 31–32 (stating that both "[p]unitive damages and attorneys['] fees are available to [Biologyx] in this case" but making arguments only regarding punitive damages). The Court therefore agrees with Celularity that Biologyx has not established a basis to depart from the general rule against awarding attorneys' fees and will **GRANT** Celularity's Motion for Partial Summary Judgment as to Biologyx's request for attorneys' fees.

### 3. *Consequential/lost profits damages*

Bringing up the rear is the most complex of the damages issues on which Celularity has moved for summary judgment: the availability of consequential damages, which includes whether the lost profits Biologyx seeks to recover are consequential damages. Biologyx seeks to recover lost profit damages for Interfyl, as well as "lost profits for Biovance 3L arising from wrongful termination." *See* Biologyx MSJ at 31. Celularity, however, contends that the lost profits Biologyx seeks are consequential damages explicitly limited by the Agreement and moves for summary judgment as to those damages (as well as to any other consequential damages). *See* Opp. to Biologyx MSJ at 34–37; Celularity MSJ at 33–36. Having considered the parties' arguments on this issue, the Court agrees with Celularity that Biologyx may not recover lost profits related to the termination of the Agreement (including for Biovance 3L) or consequential damages. The

Court, however, finds that the lost profits damages for Interfyl sought by Biologyx are not consequential damages and are therefore potentially recoverable.

The Court begins by examining the text of the relevant damages limitation clause in the Agreement, which provides:

> NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL, OR INDIRECT DAMAGES ARISING FROM OR RELATING TO ANY BREACH OF THIS AGREEMENT, REGARDLESS OF ANY NOTICE OF THE POSSIBLITY OF SUCH DAMAGES. NOTWITHSTANDING THE FOREGOING, NOTHING IN THIS PARAGRAPH IS INTENDED TO LIMIT OR RESTRICT THE INDEMNIFICATION RIGHTS OR OBLIGATIONS OF ANY PARTY UNDER SECTIONS 10.3 AND 10.4, DAMAGES AVAILABLE FOR BREACHES OF THE CONFIDENTIALITY OBLIGATIONS SET FORTH IN ARTICLE 7, OR DAMAGES FOR WRONGFUL TERMINATION OF THIS AGREEMENT.

Agreement § 10.6 ("Damages Limitation Provision").

Biologyx does not suggest that the Agreement's Damages Limitation Provision is somehow unenforceable, *see* Biologyx MSJ at 31–34, which is consistent with the treatment of these provisions under Delaware law. *See eCommerce Indus., Inc. v. MWA Intel., Inc.*, No. 7471, 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013) ("Under Delaware law, limitation on liability clauses that preclude various types of damages, such as consequential damages, are typically enforceable."). Unless they fall under one of the exceptions listed in the second sentence of the Damages Limitation Provision, consequential damages are therefore barred under the Agreement.

And, here, none of those exceptions apply, though Biologyx asserts that the wrongful termination exception does apply. *See* Biologyx MSJ at 32. That argument fails because the Court has already rejected Biologyx's assertion of a wrongful termination counterclaim. *See supra* Section III.B.2.a.iv. The Court will therefore **GRANT** Celularity's Motion for Partial Summary Judgment as to consequential damages and any damages—consequential or otherwise—stemming from the termination of the Agreement (including for Biovance 3L).

The Court, however, will allow Biologyx's request of lost profit damages stemming from any breach of the Agreement related to Interfyl prior to the termination of the Agreement to survive summary judgment. The Court does so because it agrees with Biologyx that those lost profits are best characterized as direct, not consequential damages. *See* Biologyx MSJ at 33–34.

"Lost profits may be classified as either direct damages or consequential damages, depending on the factual situation." *Cilag GmbH Int'l v. Hospira Worldwide, LLC*, No. 22-589, 2022 WL 17475481, at *3 (D. Del. Dec. 6, 2022), *report and recommendation adopted*, 2022 WL 18024815 (D. Del. Dec. 30, 2022) (citation modified).

As the Delaware Court of Chancery has explained,

> [L]ost profits are considered consequential damages when "as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." By contrast, lost profits are not considered consequential damages when "profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed."

*eCommerce*, 2013 WL 5621678, at *47 (Del. Ch. Sept. 30, 2013) (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109–10 (2d Cir. 2007)).

Here, the Court finds that profits on the sale of Interfyl (made through reimbursement of the medication via Part B) were precisely what Biologyx bargained for. The Agreement "clearly contemplated that" Biologyx "would resell" Interfyl that would be reimbursed through Part B[30]; in fact, "[t]hat was the very essence of the contract." *Biotronik A.G. v. Conor Medsystems Ireland,*

---

[30] For the avoidance of doubt, this conclusion is not at odds with the Court's interpretation of the parties' obligations under the Agreement. *See supra* Section III.B.1. It is one thing for the Agreement to contemplate that Interfyl would be reimbursed through Part B; it is quite another for the Agreement to allocate to a party the responsibility of ensuring that Interfyl was always properly reimbursed through Part B.

*Ltd.*, 22 N.Y.3d 799, 808 (2014).[31]  The sales forecasts incorporated in the Agreement are, for instance, contingent on government actors "not taking any action to adversely affect the Medicare Part B coverage."  Agreement, Ex. B.  Accordingly, if Celularity did in fact breach its Government Action Force Majeure Obligations to cure a reimbursement-related issue, then any Interfyl profits Biologyx lost as a result "would be the 'natural and probable consequence' of that breach."  *Biotronik*, 22 N.Y.3d at 808 (quoting *Tractebel*, 487 F.3d at 108).  To deny recovery of those profits would thus deny Biologyx of the benefit of its bargain.  *See Cilag*, 2022 WL 17475481, *3 (categorizing lost profits as direct damages based on allegations that the defendant's "failure to meet its required production under the [agreement] directly resulted in [plaintiffs'] inability to sell the product [defendant] was supposed to manufacture, causing [p]laintiffs to lose any ability to sell [the product at issue] and profit from the [agreement] and thereby denying them the benefit of their bargain" (citation modified)).

The Court accordingly finds that the Interfyl lost profits described above are direct damages not barred by the Damages Limitation Provision.  *See Gardensensor, Inc. v. Stanley Black & Decker, Inc.*, No. 12-3922, 2014 WL 4764628, at *4 (N.D. Cal. Sept. 24, 2014) (applying Delaware law and "find[ing] that a reasonable juror could conclude that the lost profits sought by [the plaintiff] are what [the plaintiff] bargained for when it entered into the agreement" and "[t]herefore, [plaintiff's] lost profits are not barred by the damages limitation provision in the agreement").  As such, the Court will **DENY** Celularity's Motion for Partial Summary Judgment

---

[31] *Biotronik* applies New York law.  *See id.*  But courts—including Delaware courts—examining lost profits under Delaware law frequently rely on cases applying New York law.  *See, e.g.*, *eCommerce*, 2013 WL 5621678, at *47 (the Delaware Court of Chancery "accept[ing] the Second Circuit's cogent explanation [under New York law] in *Tractebel*," 487 F.3d at 109–10, "as to when lost profits are considered consequential damages").

as to lost profit damages stemming from any breach of the Agreement related to Interfyl prior to the termination of the Agreement.[32]

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT in part** and **DENY in part** both Celularity's Motion for Partial Summary Judgment and Biologyx's Motion for Partial Summary Judgment.  The Court will further **DENY** Biologyx's Cross-Motion to Amend its Counterclaim as **MOOT** and **DISMISS** Biologyx's counterclaim for breach of the covenant of good faith and fair dealing in Count V of the Counterclaim.  An appropriate Order accompanies this Opinion.


Dated: March 30, 2026

/s/ Evelyn Padin
Evelyn Padin, U.S.D.J.

---

[32] The Court does, however, remind Biologyx that "[u]nder Delaware law, 'in order to recover damages from a defendant for breach of contract, [a plaintiff] must demonstrate with reasonable certainty that defendant's breach caused the loss.'"  *Gardensensor*, 2014 WL 4764628, at *4 (quoting *Tanner v. Exxon Corp.*, No. 79C–JA–5, 1981 WL 191389, at *1 (Del. Super. Ct. July 23, 1981)).  Should Biologyx succeed on its breach of contract counterclaim, Biologyx would have to prove that any lost profit damages are not too speculative. *See id.* at *4–5.